# PIERCE, SECRETARY OF HOUSING AND URBAN DEVELOPMENT *v.* UNDERWOOD ET AL.

No. 86–1512.   Argued December 1, 1987—Decided June 27, 1988

SCALIA, J., delivered the opinion of the Court, in Part I of which all participating Members joined, in Parts II and IV of which REHNQUIST, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, in Part III of which REHNQUIST, C. J., and WHITE, STEVENS, and O'CONNOR, JJ., joined, and in Part V of which REHNQUIST, C. J., and STEVENS, J., joined, and WHITE and O'CONNOR, JJ., joined except as to the last three lines. BRENNAN, J., filed an opinion concurring in part and concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 574. WHITE, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, *post*, p. 583. KENNEDY, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Merrill* argued the cause for petitioner. On the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber, Charles A. Rothfeld, William Kanter, John S. Koppel*, and *Gershon M. Ratner*.

*Mary S. Burdick* argued the cause for respondents. With her on the brief was *Richard A. Rothschild.**

JUSTICE SCALIA delivered the opinion of the Court.

Respondents settled their lawsuit against one of petitioner's predecessors as Secretary of Housing and Urban Devel-

*Briefs of *amici curiae* urging affirmance were filed for Battles Farm Co. et al. by *Gerald Goldman* and *Thomas D. Goldberg;* for the National Organization of Social Security Claimants' Representatives by *Robert E. Rains* and *Nancy G. Shor;* for the San Francisco Lawyers' Committee for Urban Affairs et al. by *Marilyn Kaplan;* for the Small Business Foundation of America, Inc., et al. by *David Overlock Stewart;* and for Vernice Dubose et al. by *Dennis J. O'Brien* and *William H. Clendenen, Jr.*

opment, and were awarded attorney's fees after the court found that the position taken by the Secretary was not "substantially justified" within the meaning of the Equal Access to Justice Act (EAJA), 28 U. S. C. § 2412(d). The court also determined that "special factors" justified calculating the attorney's fees at a rate in excess of the $75-per-hour cap imposed by the statute. We granted certiorari, 481 U. S. 1047 (1987), to resolve a conflict in the Courts of Appeals over important questions concerning the interpretation of the EAJA. Compare *Dubose* v. *Pierce*, 761 F. 2d 913 (CA2 1985), cert. pending, No. 85–516, with 761 F. 2d 1342 (CA9 1985) *(per curiam)*, as amended, 802 F. 2d 1107 (1986) (case below).

I

This dispute arose out of a decision by one of petitioner's predecessors as Secretary not to implement an "operating subsidy" program authorized by § 236 as amended by § 212 of the Housing and Community Development Act of 1974, Pub. L. 93–383, 88 Stat. 633, formerly codified at 12 U. S. C. §§ 1715z–1(f)(3) and (g) (1970 ed., Supp. IV). The program provided payments to owners of Government-subsidized apartment buildings to offset rising utility expenses and property taxes. Various plaintiffs successfully challenged the Secretary's decision in lawsuits filed in nine Federal District Courts. See *Underwood* v. *Pierce*, 547 F. Supp. 256, 257, n. 1 (CD Cal. 1982) (citing cases). While the Secretary was appealing these adverse decisions, respondents, members of a nationwide class of tenants residing in Government-subsidized housing, brought the present action challenging the Secretary's decision in the United States District Court for the District of Columbia. That court also decided the issue against the Secretary, granted summary judgment in favor of respondents, and entered a permanent injunction and writ of mandamus requiring the Secretary to disburse the accumulated operating-subsidy fund. See *Underwood* v. *Hills*, 414 F. Supp. 526, 532 (1976). We stayed the Dis-

trict Court's judgment pending appeal. *Sub nom. Hills* v. *Cooperative Services, Inc.*, 429 U. S. 892 (1976). The Court of Appeals for the Second Circuit similarly stayed, pending appeal, one of the eight other District Court judgments against the Secretary. See *Dubose* v. *Harris*, 82 F. R. D. 582, 584 (Conn. 1979). Two of those other judgments were affirmed by Courts of Appeals, see *Ross* v. *Community Services, Inc.*, 544 F. 2d 514 (CA4 1976), and *Abrams* v. *Hills*, 547 F. 2d 1062 (CA9 1976), vacated *sub nom. Pierce* v. *Ross*, 455 U. S. 1010 (1982), and we consolidated the cases and granted the Secretary's petitions for writs of certiorari to review those decisions, *Harris* v. *Ross*, 431 U. S. 928 (1977). Before any other Court of Appeals reached a decision on the issue, and before we could review the merits, a newly appointed Secretary settled with the plaintiffs in most of the cases. The Secretary agreed to pay into a settlement fund $60 million for distribution to owners of subsidized housing or to tenants whose rents had been increased because subsidies had not been paid. The present case was then transferred to the Central District of California for administration of the settlement.

In 1980, while the settlement was being administered, Congress passed the EAJA, 28 U. S. C. § 2412(d), which as relevant provides:

> "(1)(A) Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . , incurred by that party in any civil action . . . brought by or against the United States . . . , unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

> .      .      .      .      .

> "(2) For the purposes of this subsection—

> "(A) 'fees and other expense' includes . . . reasonable attorney fees (The amount of fees awarded under this

subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that . . . (ii) attorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.)."

The District Court granted respondents' motion for an award of attorney's fees under this statute, concluding that the Secretary's decision not to implement the operating-subsidy program had not been "substantially justified." The court determined that respondents' attorneys had provided 3,304 hours of service and that "special factors" justified applying hourly rates ranging from $80 for work performed in 1976 to $120 for work performed in 1982. This produced a base or "lodestar" figure of $322,700 which the court multiplied by three-and-one-half (again because of the "special factors"), resulting in a total award of $1,129,450.

On appeal, the Court of Appeals for the Ninth Circuit held that the District Court had not abused its discretion in concluding that the Secretary's position was not substantially justified. 761 F. 2d, at 1346. The Court of Appeals also held that the special factors relied on by the District Court justified increasing the hourly rates of the attorneys, but did not justify applying a multiplier to the lodestar amount. It therefore reduced the award to $322,700. *Id.*, at 1347–1348; see 802 F. 2d, at 1107.

We granted the Secretary's petition for certiorari on the questions whether the Government's position was "substantially justified" and whether the courts below properly identified "special factors" justifying an award in excess of the statute's $75-per-hour cap on attorney's fees.

## II

We first consider whether the Court of Appeals applied the correct standard when reviewing the District Court's deter-

mination that the Secretary's position was not substantially justified. For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo*), questions of fact (reviewable for clear error), and matters of discretion (reviewable for "abuse of discretion"). The Ninth Circuit treated the issue of substantial justification as involving the last of these; other Courts of Appeals have treated it as involving the first. See *Battles Farm Co.* v. *Pierce*, 257 U. S. App. D. C. 6, 11–12, 806 F. 2d 1098, 1103–1104 (1986), cert. pending, No. 86–1661; *Dubose* v. *Pierce*, 761 F. 2d, at 917.

For some few trial court determinations, the question of what is the standard of appellate review is answered by relatively explicit statutory command. See, *e. g.*, 42 U. S. C. § 1988 ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee"). For most others, the answer is provided by a long history of appellate practice. But when, as here, the trial court determination is one for which neither a clear statutory prescription nor a historical tradition exists, it is uncommonly difficult to derive from the pattern of appellate review of other questions an analytical framework that will yield the correct answer.[1] See Rosen-

---

[1] JUSTICE WHITE suggests, *post*, at 583–585, that since the "substantial justification" question does not involve the establishment of "historical facts," Congress would have expected it to be reviewed *de novo*. We disagree. From the given that the issue is not one of fact, one can confidently conclude that Congress would *not* have expected, on the basis of the case law, that a clearly-erroneous standard of review would be applied, but not that it would have expected review *de novo* rather than review for abuse of discretion. See, *e. g.*, *Piper Aircraft Co.* v. *Reyno*, 454 U. S. 235, 257 (1981) (abuse-of-discretion standard applied to dismissal on *forum non conveniens* grounds); *Gulf Oil Co.* v. *Bernard*, 452 U. S. 89, 103 (1981) (order under Fed. Rule Civ. Proc. 23(d)); *Curtiss-Wright Corp.* v. *General Electric Co.*, 446 U. S. 1, 10–11 (1980) (certification under Fed. Rule Civ. Proc. 54(b)). It is especially common for issues involving what can broadly be labeled "supervision of litigation," which is the sort of issue presented here, to be given abuse-of-discretion review. See, *e. g.*, *Hensley* v. *Eckerhart*, 461 U. S. 424, 437 (1983) (attorney's fees); *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U. S. 639, 642 (1976) (dis-

berg, Judicial Discretion of the Trial Court, Viewed from Above, 22 Syracuse L. Rev. 635, 638 (1971) (hereinafter Rosenberg). No more today than in the past shall we attempt to discern or to create a comprehensive test; but we are persuaded that significant relevant factors call for an "abuse of discretion" standard in the present case.

We turn first to the language and structure of the governing statute. It provides that attorney's fees shall be awarded "unless *the court finds* that the position of the United States was substantially justified." 28 U. S. C. § 2412(d)(1)(A) (emphasis added). This formulation, as opposed to simply "unless the position of the United States was substantially justified," emphasizes the fact that the determination is for the district court to make, and thus suggests some deference to the district court upon appeal. That inference is not compelled, but certainly available. Moreover, a related provision of the EAJA requires an administrative agency to award attorney's fees to a litigant prevailing in an agency adjudication if the Government's position is not "substantially justified," 5 U. S. C. § 504(a)(1), and specifies that the agency's decision may be reversed only if a reviewing court "finds that the failure to make an award . . . was unsupported by substantial evidence." § 504(c)(2). We doubt that it was the intent of this interlocking scheme that a court of appeals would accord more deference to an agency's determination that its own position was substantially justified than to such a determination by a federal district court. Again, however, the inference of deference is assuredly not compelled.

We recently observed, with regard to the problem of determining whether mixed questions of law and fact are to be treated as questions of law or of fact for purposes of appellate review, that sometimes the decision "has turned on a determination that, as a matter of the sound administration of jus-

---

covery sanctions); see generally 1 S. Childress & M. Davis, Standards of Review §§ 4.1–4.20, pp. 228–286 (1986).

tice, one judicial actor is better positioned than another to decide the issue in question." *Miller* v. *Fenton*, 474 U. S. 104, 114 (1985). We think that consideration relevant in the present context as well, and it argues in favor of deferential, abuse-of-discretion review. To begin with, some of the elements that bear upon whether the Government's position "*was* substantially justified" may be known only to the district court. Not infrequently, the question will turn upon not merely what was the law, but what was the evidence regarding the facts. By reason of settlement conferences and other pretrial activities, the district court may have insights not conveyed by the record, into such matters as whether particular evidence was worthy of being relied upon, or whether critical facts could easily have been verified by the Government. Moreover, even where the district judge's full knowledge of the factual setting can be acquired by the appellate court, that acquisition will often come at unusual expense, requiring the court to undertake the unaccustomed task of reviewing the entire record, not just to determine whether there existed the usual minimum support for the merits determination made by the factfinder below, but to determine whether urging of the opposite merits determination was substantially justified.

In some cases, such as the present one, the attorney's fee determination will involve a judgment ultimately based upon evaluation of the purely legal issue governing the litigation. It cannot be assumed, however, that *de novo* review of this will not require the appellate court to invest substantial additional time, since it will in any case have to grapple with the same legal issue on the merits. To the contrary, one would expect that where the Government's case is so feeble as to provide grounds for an EAJA award, there will often be (as there was here) a settlement below, or a failure to appeal from the adverse judgment. Moreover, even if there is a merits appeal, and even if it occurs simultaneously with (or goes to the same panel that entertains) the appeal from the

attorney's fee award, the latter legal question will not be precisely the same as the merits: not what the law now is, but what the Government was substantially justified in believing it to have been. In all the separate-from-the-merits EAJA appeals, the investment of appellate energy will either fail to produce the normal law-clarifying benefits that come from an appellate decision on a question of law, or else will strangely distort the appellate process. The former result will obtain when (because of intervening legal decisions by this Court or by the relevant circuit itself) the law of the circuit is, at the time of the EAJA appeal, quite clear, so that the question of what the Government was substantially justified in believing it to have been is of entirely historical interest. Where, on the other hand, the law of the circuit remains unsettled at the time of the EAJA appeal, a ruling that the Government was not substantially justified in believing it to be thus-and-so would (unless there is some reason to think it has changed since) effectively establish the circuit law in a most peculiar, secondhanded fashion. Moreover, the possibility of the latter occurrence would encourage needless merits appeals by the Government, since it would know that if it does not appeal, but the victorious plaintiff appeals the denial of attorney's fees, its district-court loss on the merits can be converted into a circuit-court loss on the merits, without the opportunity for a circuit-court victory on the merits. All these untoward consequences can be substantially reduced or entirely avoided by adopting an abuse-of-discretion standard of review.

Another factor that we find significant has been described as follows by Professor Rosenberg:

> "One of the 'good' reasons for conferring discretion on the trial judge is the sheer impracticability of formulating a rule of decision for the matter in issue. Many questions that arise in litigation are not amenable to regulation by rule because they involve multifarious, fleet-

ing, special, narrow facts that utterly resist generalization—at least, for the time being.

.        .        .        .        .    .

"The non-amenability of the problem to rule, because of the diffuseness of circumstances, novelty, vagueness, or similar reasons that argue for allowing experience to develop, appears to be a sound reason for conferring discretion on the magistrate. . . . A useful analogue is the course of development under Rule 39(b) of the Federal Rules of Civil Procedure, providing that in spite of a litigant's tardiness (under Rule 38 which specifies a ten-day-from-last-pleading deadline) the trial court 'in its discretion' may order a trial by jury of any or all issues.  Over the years, appellate courts have consistently upheld the trial judges in allowing or refusing late-demanded jury trials, but in doing so have laid down two guidelines for exercise of the discretionary power. The products of cumulative experience, these guidelines relate to the justifiability of the tardy litigant's delay and the absence of prejudice to his adversary.  Time and experience have allowed the formless problem to take shape, and the contours of a guiding principle to emerge."  Rosenberg 662–663.

We think that the question whether the Government's litigating position has been "substantially justified" is precisely such a multifarious and novel question, little susceptible, for the time being at least, of useful generalization, and likely to profit from the experience that an abuse-of-discretion rule will permit to develop.  There applies here what we said in connection with our review of Rule 54(b) discretionary certification by district courts: "because the number of possible situations is large, we are reluctant either to fix or sanction narrow guidelines for the district courts to follow." *Curtiss-Wright Corp.* v. *General Electric Co.*, 446 U. S. 1, 10–11 (1980).  Application of an abuse-of-discretion standard to the present question will permit that needed flexibility.

It must be acknowledged that militating against the use of that standard in the present case is the substantial amount of the liability produced by the District Judge's decision. If this were the sort of decision that ordinarily has such substantial consequences, one might expect it to be reviewed more intensively. In that regard, however, the present case is not characteristic of EAJA attorney's fee cases. The median award has been less than $3,000. See Annual Report of the Director of the Administrative Office of the U. S. Courts, Fees and Expenses Awarded Under the Equal Access to Justice Act, pp. 99–100, Table 29 (1987) (351 of 387 EAJA awards in fiscal year 1986–1987 were against the Department of Health and Human Services and averaged $2,379). We think the generality rather than the exception must form the basis for our rule.

In sum, although as we acknowledged at the outset our resolution of this issue is not rigorously scientific, we are satisfied that the text of the statute permits, and sound judicial administration counsels, deferential review of a district court's decision regarding attorney's fees under the EAJA. In addition to furthering the goals we have described, it will implement our view that a "request for attorney's fees should not result in a second major litigation." *Hensley* v. *Eckerhart*, 461 U. S. 424, 437 (1983).

### III

Before proceeding to consider whether the trial court abused its discretion in this case, we have one more abstract legal issue to resolve: the meaning of the phrase "substantially justified" in 28 U. S. C. §2412(d)(1)(A). The Court of Appeals, following Ninth Circuit precedent, held that the Government's position was "substantially justified" if it "had a reasonable basis both in law and in fact." 761 F. 2d, at 1346. The source of that formulation is a Committee Report prepared at the time of the original enactment of the EAJA, which commented that "[t]he test of whether the Govern-

ment position is substantially justified is essentially one of reasonableness in law and fact." H. R. Conf. Rep. No. 96–1434, p. 22 (1980). In this petition, the Government urges us to hold that "substantially justified" means that its litigating position must have had "some substance and a fair possibility of success." Brief for Petitioner 16. Respondents, on the other hand, contend that the phrase imports something more than "a simple reasonableness standard," Brief for Respondents 24—though they are somewhat vague as to precisely *what* more, other than "a high standard," and "a strong showing," *id.*, at 28.

In addressing this issue, we make clear at the outset that we do not think it appropriate to substitute for the formula that Congress has adopted any judicially crafted revision of it—whether that be "reasonable basis in both law and fact" or anything else. "Substantially justified" is the test the statute prescribes, and the issue should be framed in those terms. That being said, there is nevertheless an obvious need to elaborate upon the meaning of the phrase. The broad range of interpretations described above is attributable to the fact that the word "substantial" can have two quite different—indeed, almost contrary—connotations. On the one hand, it can mean "[c]onsiderable in amount, value, or the like; large," Webster's New International Dictionary 2514 (2d ed. 1945)—as, for example, in the statement, "He won the election by a substantial majority." On the other hand, it can mean "[t]hat is such in substance or in the main," *ibid.*—as, for example, in the statement, "What he said was substantially true." Depending upon which connotation one selects, "substantially justified" is susceptible of interpretations ranging from the Government's to the respondents'.

We are not, however, dealing with a field of law that provides no guidance in this matter. Judicial review of agency action, the field at issue here, regularly proceeds under the rubric of "substantial evidence" set forth in the Administrative Procedure Act, 5 U. S. C. § 706(2)(E). That phrase

does not mean a large or considerable amount of evidence, but rather "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U. S. 197, 229 (1938). In an area related to the present case in another way, the test for avoiding the imposition of attorney's fees for resisting discovery in district court is whether the resistance was "substantially justified," Fed. Rules Civ. Proc. 37(a)(4) and (b)(2)(E). To our knowledge, that has never been described as meaning "justified to a high degree," but rather has been said to be satisfied if there is a "genuine dispute," Advisory Committee's Notes on 1970 Amendments to Fed. Rule Civ. Proc. 37(a)(4), 28 U. S. C. App., p. 601; see, *e. g., Quaker Chair Corp. v. Litton Business Systems, Inc.*, 71 F. R. D. 527, 535 (SDNY 1976), or "if reasonable people could differ as to [the appropriateness of the contested action]," *Reygo Pacific Corp. v. Johnston Pump Co.*, 680 F. 2d 647, 649 (CA9 1982); see 8 C. Wright & A. Miller, Federal Practice and Procedure § 2288, p. 790 (1970); *SEC v. Musella*, [1984] CCH Fed. Sec. L. Rep. ¶ 91,647, p. 99,282 (SDNY 1984); *Smith v. Montgomery County*, 573 F. Supp. 604, 614 (Md. 1983).

We are of the view, therefore, that as between the two commonly used connotations of the word "substantially," the one most naturally conveyed by the phrase before us here is not "justified to a high degree," but rather "justified in substance or in the main"—that is, justified to a degree that could satisfy a reasonable person. That is no different from the "reasonable basis both in law and fact" formulation adopted by the Ninth Circuit and the vast majority of other Courts of Appeals that have addressed this issue. See *United States v. Yoffe*, 775 F. 2d 447, 449–450 (CA1 1985); *Dubose v. Pierce*, 761 F. 2d, at 917–918; *Citizens Council of Delaware County v. Brinegar*, 741 F. 2d 584, 593 (CA3 1984); *Anderson v. Heckler*, 756 F. 2d 1011, 1013 (CA4 1985); *Hanover Building Materials, Inc. v. Guiffrida*, 748 F. 2d 1011, 1015 (CA5 1984); *Trident Marine Construction, Inc. v. Dis-*

*trict Engineer,* 766 F. 2d 974, 980 (CA6 1985); *Ramos* v. *Haig,* 716 F. 2d 471, 473 (CA7 1983); *Foster* v. *Tourtellotte,* 704 F. 2d 1109, 1112 (CA9 1983) *(per curiam); United States* v. *2,116 Boxes of Boned Beef,* 726 F. 2d 1481, 1486–1487 (CA10), cert. denied *sub nom. Jarboe-Lackey Feedlots, Inc.* v. *United States,* 469 U. S. 825 (1984); *Ashburn* v. *United States,* 740 F. 2d 843, 850 (CA11 1984). To be "substantially justified" means, of course, more than merely undeserving of sanctions for frivolousness; that is assuredly not the standard for Government litigation of which a reasonable person would approve.[2]

Respondents press upon us an excerpt from the House Committee Report pertaining to the 1985 reenactment of the EAJA, which read as follows:

> "Several courts have held correctly that 'substantial justification' means more than merely reasonable. Because in 1980 Congress rejected a standard of 'reasonably justified' in favor of 'substantially justified,' the test must be more than mere reasonableness." H. R. Rep. No. 99–120, p. 9 (1985) (footnote omitted).

If this language is to be controlling upon us, it must be either (1) an authoritative interpretation of what the 1980 statute meant, or (2) an authoritative expression of what the 1985 Congress intended. It cannot, of course, be the former, since it is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means. Nor can it reasonably be thought to be the latter—because it is not an explanation

---

[2] Contrary to JUSTICE BRENNAN's suggestion, *post,* at 576–577, our analysis does not convert the statutory term "substantially justified" into "reasonably justified." JUSTICE BRENNAN's arguments would have some force if the statutory criterion were "substantially *correct*" rather than "substantially *justified.*" But a position can be justified even though it is not correct, and we believe it can be substantially (*i. e.,* for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.

of any language that the 1985 Committee drafted, because on its face it accepts the 1980 meaning of the terms as subsisting, and because there is no indication whatever in the text or even the legislative history of the 1985 reenactment that Congress thought it was doing anything insofar as the present issue is concerned except reenacting and making permanent the 1980 legislation. (Quite obviously, reenacting precisely the same language would be a strange way to make a change.) This is not, it should be noted, a situation in which Congress reenacted a statute that had in fact been given a consistent judicial interpretation along the lines that the quoted Committee Report suggested. Such a reenactment, of course, generally includes the settled judicial interpretation. *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978). Here, to the contrary, the almost uniform appellate interpretation (12 Circuits out of 13) *contradicted* the interpretation endorsed in the Committee Report. See *supra*, at 565–566 (citing cases); see also *Foley Construction Co.* v. *United States Army Corps of Engineers*, 716 F. 2d 1202, 1204 (CA8 1983), cert. denied, 466 U. S. 936 (1984); *Broad Avenue Laundry and Tailoring* v. *United States*, 693 F. 2d 1387, 1391 (CA Fed. 1982). Only the District of Columbia Circuit had adopted the position that the Government had to show something "slightly more" than reasonableness. *Spencer* v. *NLRB*, 229 U. S. App. D. C. 225, 244, 712 F. 2d 539, 558 (1983), cert. denied, 466 U. S. 936 (1984). We might add that in addition to being out of accord with the vast body of existing appellate precedent, the 1985 House Report also contradicted, without explanation, the 1980 House Report ("reasonableness in law and fact") from which, as we have noted, the Ninth Circuit drew its formulation in the present case.

Even in the ordinary situation, the 1985 House Report would not suffice to fix the meaning of language which that reporting Committee did not even draft. Much less are we willing to accord it such force in the present case, since only

the clearest indication of congressional command would persuade us to adopt a test so out of accord with prior usage, and so unadministerable, as "more than mere reasonableness." Between the test of reasonableness, and a test such as "clearly and convincingly justified"—which no one, not even respondents, suggests is applicable—there is simply no accepted stopping-place, no ledge that can hold the anchor for steady and consistent judicial behavior.

## IV

We reach, at last, the merits of whether the District Court abused its discretion in finding that the Government's position was not "substantially justified." Both parties argue that for purposes of this inquiry courts should rely on "objective indicia" such as the terms of a settlement agreement, the stage in the proceedings at which the merits were decided, and the views of other courts on the merits. This, they suggest, can avoid the time-consuming and possibly inexact process of assessing the strength of the Government's position. While we do not disagree that objective indicia can be relevant, we do not think they provide a conclusive answer, in either direction, for the present case.

Respondents contend that the lack of substantial justification for the Government's position was demonstrated by its willingness to settle the litigation on unfavorable terms. Other factors, however, might explain the settlement equally well—for example, a change in substantive policy instituted by a new administration. The unfavorable terms of a settlement agreement, without inquiry into the reasons for settlement, cannot conclusively establish the weakness of the Government's position. To hold otherwise would not only distort the truth but penalize and thereby discourage useful settlements.

Respondents further contend that the weakness of the Government's position is established by the objective fact that the merits were decided at the pleadings stage. We disagree. At least where, as here, the dispute centers upon

questions of law rather than fact, summary disposition proves only that the district judge was efficient.

Both parties rely upon the objective indicia consisting of the views expressed by other courts on the merits of the Government's position. Obviously, the fact that one other court agreed or disagreed with the Government does not establish whether its position was substantially justified. Conceivably, the Government could take a position that is not substantially justified, yet win; even more likely, it could take a position that is substantially justified, yet lose. Nevertheless, a string of losses can be indicative; and even more so a string of successes. Once again, however, we cannot say that this category of objective indicia is enough to decide the present case. Respondents emphasize that every court to hear the merits (nine District Courts and two Courts of Appeals) rejected the Government's position. The Secretary responds that the stays issued by the Court of Appeals for the Second Circuit and by this Court reflect a view on the merits and objectively establish substantial justification; and that it is "unlikely that [this] Court would have granted the government's petitions [for certiorari in two cases to review this issue] had the Secretary's argument" not been substantial. Brief for Petitioner 25. Respondents reply that neither the stays nor the grants of certiorari are reliable indications of substantial merit. We will not parse these arguments further. Respondents' side of the case has at least sufficient force that we cannot possibly state, on the basis of these objective indications alone, that the District Court abused its discretion in finding no substantial justification.

We turn, then, to the actual merits of the Government's litigating position. The Government had argued that the operating-subsidy program was established in permissive rather than mandatory language: the Secretary is "*author-ized* to make, and contract to make" operating-subsidy payments. 12 U. S. C. § 1715z–1(f)(3) (1970 ed., Supp. IV) (emphasis added). This contrasts with the mandatory language Congress used when creating a related housing sub-

sidy program: the Secretary "*shall* make, and contract to make." § 1715z–1(f)(2) (emphasis added). Moreover, the Government argued that its position was supported by the decision in *Pennsylvania* v. *Lynn,* 163 U. S. App. D. C. 288, 501 F. 2d 848 (1974), which held that a program authorized through permissive statutory language could be suspended by the Secretary when he concluded that its implementation would interfere with other housing goals. Finally, the Government contended that because Congress had not authorized sufficient funds to conduct the operating-subsidy program as well as two related subsidy programs, the Secretary had discretion to suspend the operating-subsidy program.

Respondents argued in rebuttal that other statutory language made clear that the operating-subsidy program was mandatory: "[T]here shall be established an initial operating expense level . . . [which] shall be established by the Secretary not later than 180 days after August 22, 1974." 12 U. S. C. §§ 1715z–1(f)(3), 1715z–1(g) (1970 ed., Supp. IV). The "project owner shall . . . pay to the Secretary all rental charges collected in excess of the basic rental charges [and] excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments." § 1715z–1(g). Furthermore, respondents argued that *Lynn* did not support the Government's position because the Secretary did not contend here, as was the case there, that the operating-subsidy program was inconsistent. with national housing policy. They also pointed out that the most direct precedents at the time the Government took its position in the present case were the nine adverse District Court decisions. Finally, respondents argued that the Secretary did not need an additional authorization because the reserve fund from excess rental charges had accumulated tens of millions of dollars which could be used only for operating-subsidy payments.

We cannot say that this description commands the conclusion that the Government's position was substantially justi-

fied. Accordingly, we affirm the Ninth Circuit's holding that the District Judge did not abuse his discretion when he found it was not.

## V

The final issue before us is whether the amount of the attorney's fees award was proper. Here it is well established that the abuse-of-discretion standard applies. See *Hensley* v. *Eckerhart*, 461 U. S., at 437 (42 U. S. C. § 1988); *Pennsylvania.* v. *Delaware Valley Citizens' Council for Clean Air*, 478 U. S. 546, 560–561 (1986) (42 U. S. C. § 7604(d)); *id.*, at 568 (BLACKMUN, J., concurring in part and dissenting in part).

The EAJA provides that attorney's fees "shall be based upon prevailing market rates for the kind and quality of the services furnished," but "shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U. S. C. § 2412(d)(2)(A)(ii). In allowing fees at a rate in excess of the $75 cap (adjusted for inflation), the District Court relied upon some circumstances that arguably come within the single example of a "special factor" described in the statute, "the limited availability of qualified attorneys for the proceedings involved." We turn first to the meaning of that provision.

If "the limited availability of qualified attorneys for the proceedings involved" meant merely that lawyers skilled and experienced enough to try the case are in short supply, it would effectively eliminate the $75 cap—since the "prevailing market rates for the kind and quality of the services furnished" are obviously *determined* by the relative supply of that kind and quality of services.[3] "Limited availability" so

---

[3] It is perhaps possible to argue that Congress intended to create a dichotomy between the phrase "the kind and quality of services *furnished*" in the first part of § 2412(d)(2)(A), and the later reference to attorneys "qualified .... *for the proceedings involved*"—meaning the former to refer to the

interpreted would not be a "special factor," but a factor virtually always present when services with a market rate of more than $75 have been provided. We do not think Congress meant that if the rates for all lawyers in the relevant city—or even in the entire country—come to exceed $75 per hour (adjusted for inflation), then that market-minimum rate will govern instead of the statutory cap. To the contrary, the "special factor" formulation suggests Congress thought that $75 an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be. If that is to be so, the exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are necessary and can be obtained only at rates in excess of the $75 cap, reimbursement above that limit is allowed.

---

legal services provided (which may have been quite *de luxe*) and the latter to refer to the legal services really needed for the case (which may have been quite run-of-the-mine). Only those *de luxe* services really needed (the argument would run) could be reimbursed at a rate above the $75 cap. The problem with this is that both the provisions define and limit the statutory term "reasonable attorney's fees" in §2412(d)(2)(A). See *supra*, at 556–557. Since that primary term assuredly embraces the notion that the fees must relate to services of a kind and quality needed for the case, the phrase "prevailing market rates for the kind and quality of services furnished" must in fact refer to the kind and quality of services both furnished and needed. The other reading, besides distorting the text, produces the peculiar result that attorney's fees for services of a needlessly high quality would be reimbursable up to $75 per hour, but not beyond.

For the same reason of the need to preserve the intended effectiveness of the $75 cap, we think the other "special factors" envisioned by the exception must be such as are not of broad and general application.   We need not specify what they might be, but they include nothing relied upon by the District Court in this case.   The "novelty and difficulty of issues," "the undesirability of the case," the "work and ability of counsel," and "the results obtained," App. to Pet. for Cert. 16a–17a, are factors applicable to a broad spectrum of litigation; they are little more than routine reasons why market rates are what they are.   The factor of "customary fees and awards in other cases," id., at 17a, is even worse; it is not even a routine reason for market rates, but rather a description of market rates.   It was an abuse of discretion for the District Court to rely on these factors.

The final factor considered by the District Court, "the contingent nature of the fee," is also too generally applicable to be regarded as a "special" reason for exceeding the statutory cap.   This issue is quite different from the question of contingent-fee enhancement that we faced last Term, in *Pennsylvania* v. *Delaware Valley Citizens' Council for Clean Air,* 483 U. S. 711 (1987) *(Delaware Valley II).*   The EAJA differs from the sort of statutory scheme at issue there, not only because it contains this "special factor" requirement, but more fundamentally because it is not designed to reimburse reasonable fees without limit.   Once the $75 cap is exceeded, neither the client paying a reasonable hourly fee nor the client paying a reasonable contingent fee is fully compensated.   Moreover, it is impossible to regard, or to use, the EAJA as a means of fostering contingent-fee practice for nonmonetary claims (or small-dollar claims) in a certain favored category of cases.   Unlike the statutes discussed in *Delaware Valley II,* the EAJA subsidy is not directed to a category of litigation that can be identified in advance by the contingent-fee attorney.   While it may be possible to base an economically viable contingent-fee practice

upon the acceptance of nonmonetary civil-rights cases (42 U. S. C. § 1988) or Clean Air Act cases (42 U. S. C. § 7604(d)) in which there is fair prospect of victory, it is quite impossible to base such a practice upon the acceptance of nonmonetary cases in which there is fair prospect that the Government's position will not be "substantially justified." Even if a lawyer can assess the strength of the Government's case at the time of initial discussions with the prospective client, the lawyer will rarely be able to assess with any degree of certainty the likelihood that the Government's position will be deemed *so* unreasonable as to produce an EAJA award. To be sure, allowing contingency as a "special factor" might cause the EAJA to foster contingent-fee practice in the broad category of all litigation against the Federal Government. But besides the fact that such an effect would be so diluted as to be insignificant, we do not think it was Congress' purpose, in providing for reimbursement in a very small category of cases, to subsidize all contingent-fee litigation with the United States.

We conclude, therefore, that none of the reasons relied upon by the District Court to increase the rate of reimbursement above the statutory was a "special factor."

\*　　\*　　\*

We affirm the award of attorney's fees, but as to the amount of the award we vacate the judgment and remand for proceedings consistent with our opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and concurring in the judgment.

I agree that an award of attorney's fees under the Equal Access to Justice Act (EAJA) was appropriate in this case,

and I agree that the courts below did not adhere to the statutory hourly cap on fees. Therefore, I concur in the Court's judgment affirming the decision to award fees and remanding for a new determination as to the amount. I disagree, however, with some of the Court's reasoning. While I agree that appellate courts should review district court EAJA fee awards for abuse of discretion, in my view the Government may not prove that its position was "substantially justified" by showing that it was merely "reasonable." Therefore, although I join Parts I, II, and IV of the Court's opinion, I do not join Part III.[1] Further, because I believe that the Court's interpretation of the predicate showing for a party to obtain a fee award exceeding the statutory cap—that there existed "a special factor, such as the limited availability of qualified attorneys for the proceedings involved"—is stingier than Congress intended, I do not join Part V of the Court's opinion.

I

Concerned that the Government, with its vast resources, could force citizens into acquiescing to adverse Government action, rather than vindicating their rights, simply by threatening them with costly litigation, Congress enacted the EAJA, waiving the United States' sovereign and general statutory immunity to fee awards and creating a limited exception to the "American Rule" against awarding attorneys fees to prevailing parties. S. Rep. No. 96–253, pp. 1–6 (1979) (S. Rep.). Consequently, when a qualified party (as defined in the Act) prevails against the United States in an adversarial proceeding not sounding in tort, the EAJA prescribes that "a court shall award . . . fees and other expenses . . . unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U. S. C. § 2412(d)(1)(A).

---

[1] Because I view the term "substantially justified" as imposing a higher burden on the Government than does the Court, the Court's reasoning in Part IV of its opinion applies perforce to my view of the case.

In this, our first EAJA case, we are called upon to consider the phrase "substantially justified."

The Court begins, as is proper, with the plain meaning of the statutory language. The Court points out that "substantially" is not a word of precise and singular definition. Indeed, the word bears two arguably different relevant definitions: "'considerable in amount, value, or the like; large'"; and "'in substance or in the main.'" *Ante,* at 564. See also Webster's Third New International Dictionary 2280 (1976) ("considerable in amount, value, or worth"; and "having a solid or firm foundation . . . being that specified to a large degree or in the main"). The Court concludes, and I agree, that, to the extent they are different, Congress intended the latter meaning.

Unfortunately, the Court feels duty bound to go beyond the words enacted by Congress and to fashion its own substitute phrase using what it perceives to be a more legally precise term. The test upon which the Court alights is initially the "'reasonable basis both in law and fact'" standard, adopted by the courts below. *Ante,* at 565. While this phrase is often mentioned in the legislative history as the explication of "substantially justified," this alternative phraseology is inherently no more precise than the statutory language. In fact, it may be less so, for the Court equates it with "the test of reasonableness," *ante,* at 568, a standard rejected by Congress and significantly more forgiving than the one actually adopted.

The Senate Judiciary Committee considered and rejected an amendment substituting the phrase "reasonably justified" for "substantially justified." S. Rep., at 8. Clearly, then, the Committee did not equate "reasonable" and "substantial"; on the contrary, it understood the two terms to embrace different burdens. "Reasonable" has a variety of connotations, but may be defined as "not absurd" or "not ridiculous." Webster's New Third International Dictionary 1892 (1976). Even at its strongest, the term implies a posi-

tion of some, but not necessarily much, merit. However, as we have seen, "substantial" has a very different definition: "in substance or in the main." Thus, the word connotes a solid position, or a position with a firm foundation. While it is true "reasonable" and "substantial" overlap somewhat (substantial at its weakest and reasonable at its strongest) an overlap is not an identity. Therefore, although Congress may well have intended to use "substantial" in its weaker sense, there is no reason to believe, and substantial reason to disbelieve (as I will discuss below), that Congress intended the word to mean "reasonable" in *its* weaker sense.

The underlying problem with the Court's methodology is that it uses words or terms with similar, but not identical, meanings as a substitute standard, rather than as an aid in choosing among the assertedly different meanings of the statutory language. Thus, instead of relying on the legislative history and other tools of interpretation to help resolve the ambiguity in the word "substantial," the Court uses those tools essentially to jettison the phrase crafted by Congress. This point is well illustrated by the Government's position in this case. Not content with the term "substantially justified," the Government asks us to hold that it may avoid fees if its position was "reasonable." Not satisfied even with that substitution, we are asked to hold that a position is "reasonable" if "it has some substance and a fair possibility of success." Brief for Petitioner 13. While each of the Government's successive definitions may not stray too far from the one before, the end product is significantly removed from "substantially justified." I believe that Congress intended the EAJA to do more than award fees where the Government's position was one having no substance, or only a slight possibility of success; I would hope that the Government rarely engages in litigation fitting that definition, and surely not often enough to warrant the $100 million in attorney's fees Congress expected to spend over the original EAJA's 5-year life.

My view that "substantially justified" means more than merely reasonable, aside from conforming to the words Congress actually chose, is bolstered by the EAJA's legislative history. The phrase "substantially justified" was a congressional attempt to fashion a "middle ground" between an earlier, unsuccessful proposal to award fees in all cases in which the Government did not prevail, and the Department of Justice's proposal to award fees only when the Government's position was "arbitrary, frivolous, unreasonable, or groundless." S. Rep., at 2–3. Far from occupying the middle ground, "the test of reasonableness" is firmly encamped near the position espoused by the Justice Department. Moreover, the 1985 House Committee Report pertaining to the EAJA's reenactment expressly states that "substantially justified" means more than "mere reasonableness." H. R. Rep. No. 99–120, p. 9 (1985). Although I agree with the Court that this Report is not dispositive, the Committee's unequivocal rejection of a pure "reasonableness" standard in the course of considering the bill reenacting the EAJA is deserving of some weight.

Finally, however lopsided the weight of authority in the lower courts over the meaning of "substantially justified" might once have been, lower court opinions are no longer nearly unanimous. The District of Columbia, Third, Eighth, and Federal Circuits have all adopted a standard higher than mere reasonableness, and the Sixth Circuit is considering the question en banc. See *Riddle* v. *Secretary of Health and Human Services*, 817 F. 2d 1238 (CA6) (adopting a higher standard), vacated for rehearing en banc, 823 F. 2d 164 (1987); *Lee* v. *Johnson*, 799 F. 2d 31 (CA3 1986); *United States* v. *1,378.65 Acres of Land*, 794 F. 2d 1313 (CA8 1986); *Gavette* v. *OPM*, 785 F. 2d 1568 (CA Fed. 1986) (en banc); *Spencer* v. *NLRB*, 229 U. S. App. D. C. 225, 712 F. 2d 539 (1983).

In sum, the Court's journey from "substantially justified" to "reasonable basis both in law and fact" to "the test of

reasonableness" does not crystallize the law, nor is it true to Congress' intent. Instead, it allows the Government to creep the standard towards "having some substance and a fair possibility of success," a position I believe Congress intentionally avoided. In my view, we should hold that the Government can avoid fees only where it makes a clear showing that its position had a solid basis (as opposed to a marginal basis or a not unreasonable basis) in both law and fact. That it may be less "anchored" than "the test of reasonableness," a debatable proposition, is no excuse to abandon the test Congress enacted.[2]

## II

I also disagree with the Court's discussion of the circumstances supporting a fee enhancement beyond the $75-per-hour (adjusted for inflation) cap set by Congress, although I do agree that the lower courts' judgment in this regard cannot stand. The statute states that courts may not award fees in excess of this cap unless "a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies the higher fee." 28 U. S. C. § 2412(d)(2)(A)(ii). The District Court found that there was a limited availability of qualified attorneys here, and also that there were additional special factors warranting an increase. In so deciding, however, the District Court's and Court of Appeals' analyses erroneously mirrored the analysis under 42 U. S. C. § 1988, a fee-shifting statute without an hourly rate limitation. Congress clearly meant to contain the potential costs of the EAJA by limiting the hourly rate of attorneys where fees are awarded. Consequently, a consideration of factors like counsel's customary rate, while perfectly appropriate under § 1988, cannot justify exceeding the EAJA cap. To hold otherwise would render the cap nothing more than

---

[2] Because the purposes of the EAJA are different from those of Federal Rule of Civil Procedure 37 and from those served by the "substantial evidence" test used to review agency determinations, I believe the meanings given the term "substantial" in those contexts do not govern here.

advisory despite Congress' expressed intent to permit higher awards only in rare cases.

That said, our job is to decide the meaning of the term: "a special factor, such as the limited availability of qualified attorneys." The Court begins with the single expressed special factor, the "limited availability of qualified attorneys." It holds that this phrase refers to an attorney with a required, articulable specialization, and does not refer to the limited availability of attorneys experienced or skilled enough to handle the proceedings involved. The Court reasons that allowing an enhancement for extraordinary skill or experience, even if required, would render the cap nugatory, since those factors merely set the market rate. This tidy analysis is too simplistic.

The most striking aspect of the Court's holding in this regard is its willingness to ignore the plain meaning and language of the exception. After all, in the rare EAJA case where highly experienced attorneys are truly required, a neophyte lawyer is no more "qualified . . . for the proceedings involved" than a nonpatent lawyer is to handle a patent case. The Court's interpretation might nonetheless be appropriate if the cap would otherwise be actually rendered meaningless, but that is not the case here. First, we must keep in mind the nature of the cases Congress envisioned would result in a fee award: those in which the Government's position was not "substantially justified." This observation takes much of the force from the Court's reasoning, as it will be a rare case in which an attorney of exceptional skill is necessary *and* where the Government's position was weak enough to warrant an EAJA award.

Second, the phrase "limited availability of qualified attorneys," read in conjunction with "special factor," reflects a congressional judgment that if the price of lawyers generally exceeds the cap, that trend alone will not justify an increase. Therefore, awarding an enhancement in cases where extraor-

dinary experience or skill is required does not write the cap out of the statute.

Third, the Court's economic analysis assumes that the market price for services rendered will always be precisely known, an assumption I cannot share, and one that there is no reason to believe Congress shared. A "reasonable" hourly rate cannot be determined with exactitude according to some preset formulation accounting for the nature and complexity of every type of case. Therefore, courts often assume that an attorney's normal hourly rate is reasonable, or, in the case of public interest counsel, a reasonable rate is generally the rate charged by an attorney of like "skill, experience, and reputation." *Blum v. Stenson*, 465 U. S. 886, 895, n. 11 (1984). Certainly adjustments up or down are appropriate where the fee charged is out of line with the nature of the services rendered. However, such adjustments are often difficult to make given that the "prevailing market rate" is determined by reference to the particular attorney involved rather than to a minimally qualified hypothetical lawyer, *ibid.*, and that the fee determination should not become a "second major litigation." *Hensley v. Eckerhart*, 461 U. S. 424, 437 (1983). Moreover, to some extent, even in a simple case higher hourly rates may be offset by fewer hours billed due to counsel's greater efficiency. Absent the statutory cap, these factors would be used in an EAJA analysis as extensively as they are used in a § 1988 analysis. However, a showing that the particular attorney retained normally charges more than the statutory cap will, by itself, avail a fee applicant nothing under EAJA, although it may, by itself, be dispositive under § 1988.

Therefore, the Court is simply wrong when it asserts that if we allow a showing of extraordinary skill or experience (in the rare case where it is required) to justify an enhanced award, then the cap will be rendered meaningless. Far from it. The same logic supporting a "patent lawyer" exception — that when only a fraction of the bar is qualified to handle a

case, those attorneys may charge a premium for their services — supports an enhancement for skill or experience.

Equally troubling is the Court's requirement that a "special factor" must not be "of broad and general application." *Ante*, at 573. We are given no explanation of or for this limitation, beyond the declaration that it is necessary to preserve the efficacy of the cap. Further, while the Court is willing to say what is *not* a special factor—everything relied upon below—we are given no example of anything that *is* a special factor other than the subject-matter specialization already considered as falling within the "limited availability of qualified attorneys for the proceedings involved" example. Having rejected the lower courts' list of factors in its entirety, it seems as if the Court leaves nothing remaining.

Such a strained interpretation, apparently reading the words "such as" out of the Act, is unnecessary. See *Vibra-Tech Engineers, Inc.* v. *United States*, 787 F. 2d 1416 (CA10 1986); *Action on Smoking and Health* v. *CAB*, 233 U. S. App. D. C. 79, 724 F. 2d 211 (1984). Cf. *Kungys* v. *United States*, 485 U. S. 759, 778 (1988) ("[N]o provision [of a statute] should be construed to be entirely redundant"). A "special factor" may be readily analogized to the factors we identified in *Blum* to enhance the lodestar figure under § 1988. In *Blum*, we held that the lodestar amount (the reasonable hourly rate multiplied by the number of hours billed) is "presumably" the reasonable fee. However, we also held that an upward adjustment may be appropriate "in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was exceptional." 465 U. S., at 899 (internal quotations omitted).[3] Analogizing to the EAJA

---

[3] We left open whether the contingent nature of the fee could also justify an enhancement. However, much for the reasons stated by the Court, that question is not pertinent to an EAJA case. It is one thing to say that a contingent-fee enhancement is necessary to compensate an attorney

context, the lodestar would be calculated by multiplying the reasonable rate (as capped) by the number of hours billed. That amount would presumably be the proper award. However, where a factor exists that would justify an enhancement of the lodestar amount under § 1988, an enhancement of the EAJA award might also be appropriate. Unlike the lower courts' approach, this rule would not read the cap out of the statute, for as we predicted in *Blum*, a lodestar enhancement would be appropriate only in "the rare case."

Although the *Blum* enhancers constitute more than the situation where there is a limited availability of qualified counsel, the statute expressly allows more to be considered. The Court's miserly refusal to accede to this statutory command is unjustified and unwarranted. I therefore concur only in the judgment as to the fee calculation.

JUSTICE WHITE, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I agree with the majority's interpretation of the term "substantially justified" as used in the Equal Access to Justice Act (EAJA), 28 U. S. C. § 2412(d). However, because I believe that a district court's assessment of whether the Government's legal position was substantially justified should be reviewed *de novo* and that the attorney's fees award in this case could not be sustained under that standard of review, I dissent from Parts II and IV of the majority's opinion.

## I

The majority acknowledges that neither the language nor the structure of the EAJA "compel[s]" deferential review of a district court's determination of whether the Government's position was substantially justified. *Ante*, at 559. In fact, the statute is wholly silent as to the standard under which

---

when *victory* is uncertain, it is another thing entirely to say that such an enhancement is necessary to compensate an attorney when the lack of *substantial justification* is uncertain.

such determinations are to be reviewed.[1] This congressional silence in the face of both the general rule of *de novo* review of legal issues and the EAJA's special purpose of encouraging meritorious suits against the Government suggests a different result than that reached by the majority.

The Congress that adopted the EAJA certainly was aware of the general rule that issues of law are reviewed *de novo* while issues of fact are reviewed only for clear error. See Fed. Rule Civ. Proc. 52(a); *Pullman-Standard* v. *Swint,* 456 U. S. 273, 287 (1982). Congress would have known that whether or not a particular legal position was substantially justified is a question of law rather than of fact. The historical facts having been established, the question is to be resolved by the legal analysis of the relevant statutory and decisional authorities that appellate courts are expected to perform. As the District of Columbia Circuit has observed, "the special expertise and experience of appellate courts in assessing the relative force of competing interpretations and applications of legal norms makes the case for *de novo* review of judgments [of whether the Government's legal position was substantially justified] even stronger than the case for such review of paradigmatic conclusions of law." *Spencer* v. *NLRB,* 229 U. S. App. D. C. 225, 249, 712 F. 2d 539, 563 (1983), cert. denied, 466 U. S. 936 (1984). It is thus most likely that Congress expected that the courts of appeals would apply the same *de novo* standard of review to a district

---

[1] That Congress remained silent as to the standard of review to be applied to district courts' determinations of whether an attorney's fee award is appropriate, yet explicitly directed that an "abuse of discretion" standard be applied to similar determinations by governmental agencies, see 5 U. S. C. § 504(c)(2), would seem to militate against rather than in favor of the rule adopted by the majority. See *ante,* at 559. The more reasonable inference to be drawn from this difference in the statutory provisions governing court-awarded and agency-awarded attorney's fees is that Congress knew how to specify an "abuse of discretion" standard when it chose to do so and that Congress did not choose to do so with regard to attorney's fee awards by the district courts.

court's assessment of whether the Government's interpretation of the law was substantially justified for purposes of the EAJA as they would apply to a district court's assessment of whether the Government's interpretation of the law was correct in the underlying litigation.

*De novo* appellate review of whether the Government's legal position was substantially justified would also foster consistency and predictability in EAJA litigation. A court of appeals may be required under the majority's "abuse of discretion" standard to affirm one district court's holding that the Government's legal position was substantially justified and another district court's holding that the same position was not substantially justified. As long as the district court's opinion about the substantiality of the Government case rests on some defensible construction and application of the statute, the Court's view would command the court of appeals to defer even though that court's own view on the legal issue is quite different. The availability of attorney's fees would not only be difficult to predict but would vary from circuit to circuit or even within a particular circuit. Such uncertainty over the potential availability of attorney's fees would, in my view, undermine the EAJA's purpose of encouraging challenges to unreasonable governmental action. See *Spencer, supra*, at 249–250, 712 F. 2d, at 563–564.[2]

---

[2]The majority suggests that an "abuse of discretion" standard is desirable in order to limit the amount of "appellate energy" expended on cases that are unlikely to yield "law-clarifying benefits." *Ante*, at 561. I would have thought that decisions concerning the allocation of appellate resources are better left to Congress than to this Court. If the courts of appeals are to concentrate their efforts on clarifying the law, at the expense of correcting district court errors that may affect only the parties to a particular case, then Congress ought to make that policy choice. In any event, if the law of the circuit is indeed "quite clear" at the time of the EAJA appeal, *ibid.*, the appellate court may often have to expend relatively little energy in ascertaining whether the law was also reasonably clear at some earlier date. Of course, in those cases in which the law of the circuit remains unsettled at the time of the EAJA appeal, the appellate court may provide

Finally, the Federal Courts of Appeals have concluded with near unanimity that "close scrutiny," or *de novo* review, should be applied to district courts' assessments of whether the Government's legal position was substantially justified. See, *e. g., Brinker* v. *Guiffrida,* 798 F. 2d 661, 664 (CA3 1986); *United States* v. *Estridge,* 797 F. 2d 1454, 1457 (CA8 1986); *Haitian Refugee Center* v. *Meese,* 791 F. 2d 1489, 1496 (CA11 1986); *United States* v. *Yoffe,* 775 F. 2d 447, 451 (CA1 1985); *Russell* v. *National Mediation Bd.,* 775 F. 2d 1284, 1289 (CA5 1985); *Essex Electro Engineers, Inc.* v. *United States,* 757 F. 2d 247, 252–253 (CA Fed. 1985); *Hicks* v. *Heckler,* 756 F. 2d 1022, 1024–1025 (CA4 1985); *Sigmon Fuel Co.* v. *TVA,* 754 F. 2d 162, 167 (CA6 1985); *Boudin* v. *Thomas,* 732 F. 2d 1107, 1117 (CA2 1984); *United States* v. *2,116 Boxes of Boned Beef,* 726 F. 2d 1481, 1486 (CA10), cert. denied *sub nom. Jarboe-Lackey Feedlots, Inc.* v. *United States,* 469 U. S. 825 (1984); *Spencer, supra,* at 251, 712 F. 2d, at 565. This weight of appellate authority reinforces my view that whether or not the Government's interpretation of the law was substantially justified is an appropriate question for *de novo* review.

## II

I do not believe that the District Court's conclusion that the Government's position in this litigation was not substantially justified could withstand appellate scrutiny under a *de novo* standard of review.

The housing statute at issue in this case provided for three subsidy programs: a "deep-subsidy" program, an "interest-reduction" program, and an "operating-subsidy" program.

---

needed guidance both to the Government and to any individuals with similar legal claims. The majority's concern that *de novo* review will force the Government to take "needless merits appeals," *ibid.*, does not appear to be shared by the Government itself, which has argued throughout this litigation that the question whether a legal position was substantially justified ought to be reviewed under a *de novo* standard rather than an "abuse of discretion" standard.

It was the Secretary's failure to implement the last of these programs that was challenged by respondents.

The statute provided that the Secretary was *"authorized* to make, and contract to make" operating-subsidy and interest-reduction payments. 12 U. S. C. §§ 1715z–1(f)(3), 1715z–1(a) (1970 ed., Supp. IV) (emphasis added). In contrast, the statute stated that the Secretary *"shall* make, and contract to make" deep-subsidy payments. § 1715z–1(f)(2) (emphasis added). In 1974, after concluding that Congress had not authorized her to commit funds sufficient to operate all three subsidy programs, Secretary Hills decided to devote the available funds to the more clearly mandatory deep-subsidy program (and to certain pre-existing commitments under the interest-reduction program) rather than to spread the funds among all three programs.

Whether or not the courts might differ with Secretary Hills on the scope of her discretion to decline to implement the operating-subsidy program, see *ante,* at 569, given the statutory language and the existing case law, her conclusion was not without substantial justification. The statutory provisions instructing the Secretary to make deep-subsidy payments, but merely "authorizing" her to make operating-subsidy payments, could reasonably be construed as vesting the Secretary with some discretion over the implementation of the operating-subsidy program. If Congress had intended to give the Secretary no choice in the matter, it is defensible to believe that Congress would have directed that the Secretary *"shall* make, and contract to make" operating-subsidy payments.

Moreover, the then-recent decision in *Pennsylvania* v. *Lynn,* 163 U. S. App. D. C. 288, 501 F. 2d 848 (1974), offered further support for the Secretary's position. The Court of Appeals held in that case that the Secretary had not abused his discretion in suspending the interest-reduction program—under which the Secretary was likewise "authorized to make, and contract to make" payments—after he had con-

cluded that the program was not serving national housing goals. The *Lynn* case is not, of course, on all fours with this one. However, because *Lynn* suggests that the Secretary has a degree of discretion over whether to implement housing programs that are not couched in clearly mandatory statutory language, that decision would have given Secretary Hills reason to believe that such discretion could properly be exercised with regard to the operating-subsidy program.[3]

Because I would conclude upon *de novo* review that the Secretary's refusal to implement the operating-subsidy program was substantially justified, I would reverse the award of attorney's fees under the EAJA.[4]

---

[3] In *Dubose v. Pierce*, 761 F. 2d 913 (CA2 1985), cert. pending, No. 85–516, the Court of Appeals held that the Secretary's refusal to implement the operating-subsidy program was substantially justified for purposes of the EAJA. The court relied heavily on *Pennsylvania v. Lynn* in concluding that "[t]he governing law, to the extent that it existed, did not mandate HUD's surrender early in the litigation" and did not "bec[o]me so one-sided as to render HUD's position clearly unjustifiable" even after several lower courts had ruled against the Secretary on the operating-subsidy program. 761 F. 2d, at 918.

[4] The Court concludes that the amount of the award must be reconsidered. I agree in this respect and hence join Part V of the Court's opinion.