Elizabeth A. YEARY,

v.

**BOARD OF NURSE EXAMINERS FOR the STATE of Texas.**

No. 3–92–441–CV.

Court of Appeals of Texas, Austin.

June 2, 1993.

Robert Brown, Brown, Campbell, Harrison & Wright, Houston, for appellant.

Dan Morales, Atty. Gen., Frank J. Knapp, Jr., Asst. Atty. Gen., Austin, for appellee.

Before POWERS, KIDD and B.A. SMITH, JJ.

POWERS, Justice.

After a contested-case hearing, the Board of Nurse Examiners revoked the professional-nurse license held by Elizabeth A. Yeary. She sued for judicial review of the revocation order and appeals now from the district-court judgment affirming the order. *See* Tex.Rev.Civ.Stat.Ann. art. 4525(b), (c) (West Supp.1993); Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, §§ 19, 20 (West Supp.1993). We will reverse the agency order and the judg-ment below, remanding the cause to the district court with instruction that it be remanded to the Board for proceedings not inconsistent with our opinion.

## THE CONTROVERSY

In its regulation of nursing, the Board administers the provisions of article 4525(a), a statute that establishes the grounds upon which the Board is authorized to suspend or revoke a professional nurse's license. Tex.Rev.Civ.Stat.Ann. art. 4525(a) (West Supp.1993). In Yeary's case, the Board, after notice and hearing, revoked her license on the following statutory grounds:

(9) Unprofessional ... conduct which, in the opinion of the board, is likely to deceive, defraud, or injure patients or the public.

....

(11) Lack of fitness to practice by reason of mental or physical health that could result in injury to patients or the public.

The Board's final order determined that these grounds were established by the evidence in Yeary's case and listed several findings of fact in support thereof. We will discuss them below.

Yeary sued in district court for judicial review of the Board's final order and for injunctive relief against its enforcement. The terms of article 4525(c) authorize such suits. We cannot find, however, that any statute defines the scope of review in such cases. Under APTRA section 19(e), therefore, the scope of review is that specified for a "substantial evidence" review. APTRA § 19(e). In its final judgment, the district court concluded the Board's final order was supported by substantial evidence and was not based upon an abuse of discretion. *See* APTRA § 19(e)(5), (6).

Yeary appeals to this Court on a single point of error in which she contends: (1) the Board's determinations are not supported by substantial evidence; and (2) the revocation of her license was an excessive penalty.

## UNPROFESSIONAL CONDUCT

To amount to "unprofessional conduct," the nurse's behavior must be such that, in the Board's opinion, it "is likely to deceive, defraud, or injure patients or the public." Tex.Rev.Civ.Stat.Ann. art. 4525(a)(9) (West Supp.1993). By regulation, the Board has defined the term "unprofessional conduct" to include "knowingly or consistently failing to make entries ... in records pertaining to the giving of medications" and "failing to administer medications ... in a responsible manner." 22 Tex.Admin.Code §§ 217.13(3), (6) (Supp.1993). In its final order, the Board concluded that Yeary's conduct was unprofessional because her behavior fell within these two rules.

■ *Failing to make entries in records pertaining to the giving of medications.* This conclusion of law rests on certain findings of fact recited in the Board's final order. They are as follows: (1) A document entitled "24–hour Nurse's Record" is a record "pertaining to the giving of medications"; (2) on ten occasions involving three patients, over a four-day period, Yeary received Demerol to administer to the patients but "failed to document" in the "24–hour Nurse's Record," under "circumstances that indicate a disregard of patient safety and welfare," that she had, in fact, administered the drug; (3) the "24–hour Nurse's Record" is also "a document where unusual circumstances pertaining to the patient's treatment and welfare are recorded"; and (4) Yeary failed to record in the "24–hour Nurse's Record" that she had on one occasion administered Demerol to a patient twenty-five minutes before it was scheduled to be administered, an unusual circumstance, indicating "a disregard of patient safety and welfare."

The evidence relating to the above findings is undisputed as far as it goes. It established that Yeary failed to enter on the "24–hour Nurse's Record" that she had administered Demerol on the ten occasions. The evidence is also undisputed, however, that such was *not* a requirement of the hospital where the default occurred. Instead, in conformance with hospital policy, Yeary made the entries on another record entitled "the Medication Administration Record." Hospital policy *did* require that "unusual circumstances" be recorded in the "24–hour Nurse's Record," however, and a "nurse manager" employed by the hospital testified without contradiction that she would have expected, under standard nursing practices, that Yeary would have entered in that record the fact that she had administered Demerol to a patient twenty-five minutes before it was scheduled. Yeary did not make such an entry in the "24–hour Nurse's Record," although she did make the entry in "the Medication Administration Record" as she did with respect to the nine other administrations of Demerol.

An essential element of unprofessional conduct, under article 4525(a) and the regulations promulgated thereunder, is that the nurse's conduct be "likely to deceive, defraud, or injure patients or the public." The only evidence that appears to relate to this element is found in questions a board member asked the nurse manager, and the replies thereto, as follows:

Q. On Charge I, the section cited in the Nurse Practice Act deals with failing to make entries. It goes on to end with the statement about a disregard for patient safety and welfare. Do you have any information to tell me about the patient and his or her clinical status at that point during this medication administration experience over these three days—one, two—four days? Was the clinical status of the patient—what was the clinical status of the patient—these four patients?

A. Post-op patients.

Q. Were they stable?

A. Yes, uh-huh.

Q. Okay. Was there any unplanned event in their recovery sequence? Was there an unplanned event in their recovery sequence?

A. Not that I can think of, no.

According to our understanding of this testimony, Yeary's default concerning the entries did not in fact result in injury to anyone; the testimony does not suggest that Yeary's conduct was likely to result in

injury to anyone. Indeed, the record contains no evidence from which one might reasonably conclude that Yeary's failure to make the entries on the "24–hour Nurse's Record," instead of or in addition to "the Medication Administration Record," was "likely to deceive, defraud, or injure patients or the public."

We hold, in consequence, that the Board's order is not supported by substantial evidence in its conclusion of law that Yeary's conduct was unprofessional because she knowingly or consistently failed to make entries in records pertaining to the giving of medications. *See Board of Law Examiners v. Stevens*, 850 S.W.2d 558 (Tex.App.—Austin 1992, writ requested) (agency order refusing license to practice law not supported by substantial evidence where no showing made, as agency rules required, that applicant's past conduct would probably result in future injury to clients, obstruction of justice, or disciplinary violation); *see also Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) ("substantial evidence" is that quality of evidence a reasonable mind might accept as adequate to support a conclusion).

■ *Failing to administer medication in a responsible manner.* This conclusion of law, made by the Board in its final order, refers to the incident where Yeary administered the Demerol to a patient twenty-five minutes before it was scheduled to be administered. The fact of early administration of the Demerol is undisputed. Again, however, there is no evidence that the early administration of the medication harmed the patient or was "likely to deceive, defraud, or injure patients or the public" as the statute and regulations require before conduct may be said to be unprofessional. For the reasons given previously, we hold the Board's conclusion of law is not supported by substantial evidence.

## LACK OF FITNESS TO PRACTICE

At another hospital, Yeary was employed to work in a unit that treated patients with drug problems. On May 23, 1989, the undisputed evidence showed, she was "very distracted, very confused, not focused on any one thing." Her speech was slurred and she walked with a slow, uneven gait. She thrice mislaid her ring of keys, which included a key to the narcotics locker. Another nurse found the keys, and Yeary stated she did not wish to carry them. As a result, the keys were taken from Yeary, and she was forbidden to give medication to patients that day. She interrupted a patient-counseling session to deliver mail, contrary to hospital policy that such sessions be interrupted only at a physician's direction. She cried and was apologetic. She was not sent home.

■ Under article 4525(a)(11), Yeary's license could be revoked for "[l]ack of fitness to practice by reason of mental or physical health that could result in injury to patients or the public." Before we assess the body of evidence in this regard, we should fix the meaning of this statutory provision. When first included as a ground for the suspension or revocation of a nurse's license, the provision referred to a "[l]ack of fitness to practice by reason of mental or physical health or otherwise." Act of May 23, 1979, 66th Leg., R.S., ch. 590, § 8, 1979 Tex.Gen.Laws 1220, 1223. The next session of the legislature amended the provision by adding the emphasized words, as follows: "Lack of fitness to practice by reason of mental or physical health *that could result in injury to patients or the public.*" Act of June 1, 1981, 67th Leg., R.S., ch. 772, § 3, 1981 Tex.Gen.Laws 2886, 2892. The word "could," an equivalent of "can," expresses a contingency in our view; hence, the statutory provision refers to a physical or mental disease, ailment, or condition that might cause injury to patients or the public if the individual engages in any of the activities authorized by a professional nurse's license.

We believe, moreover, that the statutory language necessarily implies an element of reasonableness in the Board's determining whether, in a particular case, the nurse's mental or physical health "could result in injury to patients or the public." This statutory expression is about as broad and

abstract as it can be, encompassing in its literal terms the most disabling health problems as well as the least serious, any of which might, in the abstract or in some hypothetical situations, pose a risk of injury to patients or the public. These health problems range from adjudicated, violent insanity to a temporary emotional reaction to a family situation, from an amputated limb to a broken finger in a splint, from absolute blindness to corrected nearsightedness, from alcohol addiction to controlled hypertension. The reasonableness of the Board's conclusion—that the nurse's mental or physical health "could result in injury to patients or the public"—must therefore be demonstrated in the context of the particular case.

■ It was the Board's duty to supply a "concise and explicit statement of the underlying facts *supporting* " its conclusion of law that Yeary's mental or physical health "could result in injury to patients or the public." APTRA § 16(b) (emphasis added). The Board did not do so; the underlying facts stated in the Board's order do not even identify a disease, ailment, or other health condition. The Board's findings of fact refer only to her *behavior* on a single day—May 23, 1989. Nevertheless, Yeary does not complain on the basis of APTRA § 16(b). She does complain, however, that the Board's conclusion is not supported by substantial evidence, and under the prevailing interpretation of APTRA § 19(e)(5), we must inquire whether the Board's conclusion is reasonably supported by "the record," including the findings of fact expressed in the Board's final order and the evidence received before the Board.[1] We should also state that we cannot ourselves make fact findings from the evidence which *we* believe would support

the Board's conclusion of law had they been made by the Board. In our review, we are limited to the *factual* grounds the Board actually gave as the basis for its conclusion of law, although we may affirm the order on a *legal* ground not mentioned by the Board in its final order. *See Gulf Land Co. v. Atlantic Refining Co.*, 134 Tex. 59, 131 S.W.2d 73, 84 (1939). As to the factual grounds stated by the Board as the basis for its conclusion of law, however, we must judge the validity of the Board's order "by what it says." *See Morgan Drive Away, Inc. v. Railroad Comm'n,* 498 S.W.2d 147, 152 (Tex.1973).

■ We have summarized previously the evidence regarding Yeary's behavior on May 23, 1989, and the Board's findings which describe that behavior. The unit manager testified that such behavior was not typical of Yeary; indeed, it was very unusual in comparison to her customary behavior. That is all the evidence that might support the Board's conclusion that Yeary was not fit to practice nursing "by reason of mental or physical health that could result in injury to patients or the public." The evidence does *not* indicate the following: (1) *what* underlying disease, ailment, or other condition led to Yeary's atypical behavior on the single day it was observed—May 23, 1989; (2) whether the condition was temporary or permanent, the result of voluntary or involuntary acts on Yeary's part, or whether the condition was controllable or curable or otherwise susceptible of being managed to prevent a recurrence of such behavior; or (3) whether the behavior was likely to recur. Indeed, the evidence suggests Yeary was never examined or tested at any time to determine the state of her mental or physical health or the underlying reason for her behavior on

---

**1.** The Supreme Court of Texas is committed to this view of the "substantial-evidence rule," as described at length in *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.,* 665 S.W.2d 446, 452–53 (Tex.1984). There the court held that subsections (5) and (6) of APTRA § 19(e) were "two sides of the same coin" and that the "substantial-evidence rule" encompassed judicial review of both elements of the agency's reasoning process: (1) does the evidence reasonably support the agency's findings

of underlying fact; and (2) do the findings of underlying fact reasonably support the agency's findings of ultimate fact or conclusions of law? *See generally* Kerry McGrath, *Substantial Evidence Review in Texas—Still Insubstantial After All These Years,* 44 Baylor L.Rev. 223 (1992); John Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases,* 16 Texas Tech L.Rev. 475 (1985).

May 23, 1989. There is no evidence that such behavior has recurred.

We believe a reasoning mind could not conclude from the body of evidence that Yeary's physical or mental health was such that it could result in injury to patients or the public if she was allowed to continue to practice as a professional nurse. We therefore hold the Board's findings of fact and conclusions of law, relating to Yeary's fitness to practice, are not supported by substantial evidence. *See* APTRA § 19(e)(5).

Because we have sustained Yeary's first contention on appeal, we need not consider her second appellate contention that the revocation of her license was an excessive penalty.

For the reasons given, we reverse the Board's final order and the district-court judgment. We remand the cause to the district court with instruction that it be remanded to the Board for proceedings not inconsistent with our opinion.