T.C. Memo. 1997-214

UNITED STATES TAX COURT

CAROLYN S. EIFERT, A/K/A SUE ARMSTRONG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12155-96.                          Filed May 7, 1997.

<u>Leland Franks</u>, for petitioner.

<u>Katherine Holmes Ankeny</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, <u>Special Trial Judge</u>:  This case is before the Court
on petitioner's motion to recover administrative and litigation

costs[1] pursuant to section 7430 and Rule 231.[2]

Respondent concedes that petitioner substantially prevailed as to the amount in controversy.  See sec. 7430(c)(4)(A)(ii)(I). The issues remaining for decision are as follows:

(1) Whether respondent's position in the administrative and court proceedings was substantially justified;

(2) whether petitioner satisfied the net worth requirement prescribed by section 7430(c)(4)(iii);

(3) whether petitioner exhausted administrative remedies;

(4) whether petitioner protracted the administrative and court proceedings; and

(5) whether the attorney's fees and other costs that petitioner seeks to recover are reasonable in amount.

Neither party requested an evidentiary hearing, and the Court concludes that a hearing is not necessary for the proper disposition of petitioner's motion.  Rule 232(a)(3).  We therefore decide the matter before us based on the pleadings, petitioner's motion, respondent's response to petitioner's

---

[1] Although petitioner's motion is styled "Motion for Payment of Litigation Costs", we are satisfied that petitioner intended to move for an award of both administrative costs and litigation costs.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue.  All references to section 7430 are to such section in effect at the time that the petition was filed.  All Rule references are to the Tax Court Rules of Practice and Procedure.

motion, and petitioner's reply to respondent's response, as well as the various exhibits and affidavits attached thereto.

Carolyn S. Eifert (petitioner) resided in Hobbs, New Mexico, at the time that her petition was filed with the Court.

## FINDINGS OF FACT

In the mid-1980's, petitioner owned an unincorporated business known as "Eifert's Fashions & Shoes".

In July 1985, petitioner filed a petition in bankruptcy with the Bankruptcy Court for the District of New Mexico (the bankruptcy court). Petitioner filed her petition in bankruptcy under chapter 7 of title 11 of the United States Code. Petitioner was represented before the bankruptcy court by an attorney (petitioner's bankruptcy attorney).

Petitioner attached to her petition in bankruptcy a schedule setting forth all of her liabilities. Among the liabilities set forth on such schedule was a debt owed to Moncor Bank of Hobbs, New Mexico, in the amount of $127,960 (the Moncor Bank debt).

In September 1986, petitioner was granted a discharge from all dischargeable debts by the bankruptcy court (the Discharge of Debtor). Subsequently, in February 1989, after petitioner's bankruptcy estate had been fully administered, the bankruptcy court entered a final decree closing petitioner's bankruptcy case (the Final Decree).

At some point in time not clearly disclosed by the record, but before February 1994, Moncor Bank was taken over by the Federal Deposit Insurance Corp. (FDIC) and placed in receivership.

On or about January 31, 1994, petitioner received four Forms 1099-G (the Forms 1099-G). Each of the Forms 1099-G was issued for the calendar year 1993 and referenced petitioner's tax identification number. Each of the Forms 1099-G disclosed income from discharge of indebtedness in the identical amount of $251,203.73 and stated that such income was being reported to the Internal Revenue Service (IRS).

Two of the Forms 1099-G were purportedly issued by Arizona Commerce Bank c/o the FDIC in Denver, Colorado (the original Forms 1099-G).[3] The original Forms 1099-G disclosed the employer identification number (EIN) of the issuer of such forms as 86-0381653. The other two Forms 1099-G were marked "correction" and were purportedly issued by "c/o" the FDIC in Denver, Colorado (the corrected Forms 1099-G). The corrected Forms 1099-G did not disclose the EIN of the issuer of such forms.

One of the original Forms 1099-G was issued to petitioner and referenced account number 2495-2495000186271A<u>B</u>, whereas the other such form was issued to "Eifert's Fashions/Shoes" and referenced account number 2495-2495000186271A<u>A</u>. Similarly, one

---

[3] The record does not disclose what relationship, if any, Arizona Commerce Bank may have had to Moncor Bank.

of the corrected Forms 1099-G was issued to petitioner and referenced account number 2495-2495000186271A<u>B</u>, whereas the other such form was issued to "Eifert's Fashions/Shoes" and referenced account number 2495-2495000186271A<u>A</u>.

On or about January 31, 1994, petitioner also received two letters dated January 28, 1994, from the FDIC in Dallas, Texas. One letter was addressed to petitioner and the other letter was addressed to "Eifert's Fashions & Shoes". Each letter referenced account number 2495000186271 and the FDIC office in Denver, Colorado. Both letters stated as follows:

> You will, or have already received Internal Revenue Service form 1099G which reports to IRS the full or partial discharge of your indebtedness with respect to the debt obligation noted above. The filing of this report with the IRS is required by section 6050P of the Internal Revenue Code of 1986. The reporting requirement applies to all debts discharged in full or in part, on or after the effective date of August 10, 1993. The amount discharged may or may not be taxable income to you, depending upon your own circumstances. You should consult with your tax advisor to determine whether you must report this amount as taxable income.

In 1993, a Form 1099-G was used to report certain government payments. In particular, box 5 of such form was used to report discharge of indebtedness by a Federal government agency, such as the FDIC. See sec. 6050P(c)(1)(B). The "Instructions for Recipient" for box 5 provided in pertinent part as follows:

> Box 5.--Shows your indebtedness to a Federal government agency that was discharged this year as no longer collectible. This debt generally becomes taxable income to you at the time the debt is discharged.

There are exceptions to this rule--for example, if you are insolvent or have declared bankruptcy.

Upon receipt of the Forms 1099-G, petitioner contacted her bankruptcy attorney, who advised her to disregard the Forms 1099-G because petitioner had previously been granted a discharge in bankruptcy in September 1986. Petitioner accepted her bankruptcy attorney's advice and did not, at that time, pursue the matter any further.

Petitioner did not file a Federal income tax return for the taxable year 1993 because her income for that year did not exceed the filing threshold. See sec. 6012(a)(1).

Information returns (i.e., Forms 1099-G) reporting the receipt of discharge-of-indebtedness income by petitioner for the taxable year 1993 were filed with respondent (the information returns). Data from the information returns, as compiled by respondent, revealed the following:

| | Payor | Payor's EIN | Payee | Amount |
|---|---|---|---|---|
| (1) | Stockmen's Bk & Tr Co. c/o FDIC[1] | 83-0199850 | Eifert's Fashions/Shoes | $251,203 |
| (2) | Stockmen's Bk & Tr Co. c/o FDIC | 83-0199850 | Eifert's Fashions/Shoes | 251,203 |
| (3) | FDIC | 75-2193552 | Eifert's Fashions/Shoes | 251,203 |
| (4) | FDIC | 75-2193552 | Petitioner | 251,203 |

[1] The record does not disclose what relationship, if any, Stockmen's Bank and Trust Co. may have had to Moncor Bank.

On or about November 20, 1995, respondent's service center in Austin, Texas (the Austin service center) sent a 30-day letter to petitioner (the 30-day letter). The 30-day letter stated that respondent had no record of receiving an income tax return from petitioner for the taxable year 1993. The 30-day letter then proposed a deficiency in petitioner's income tax and additions to tax for 1993 based on income reported to respondent by third parties. Such income included discharge-of-indebtedness income in the amount of $1,004,812, i.e., the sum of the amounts appearing on the information returns as set forth above.[4] The 30-day letter stated that petitioner could appeal "the proposed assessment" to the IRS Appeals Office.

The 30-day letter was mailed to petitioner at her former address in Albuquerque, New Mexico (the Albuquerque address).[5] The Albuquerque address was petitioner's address as it appeared in respondent's computer records at the time that the 30-day letter was sent (i.e., on or about November 20, 1995). Prior thereto, on October 23, 1995, petitioner filed a Federal income tax return for the taxable year 1994. Petitioner listed her address on her 1994 return as P.O. Box 405, Hobbs, New Mexico

---

[4] The proposed deficiency was also based on $5,003 of unreported interest, dividends, and gain from the sale of securities. A single individual having only such amount of income in 1993 was not required to file an income tax return for that year. Sec. 6012(a)(1).

[5] Petitioner moved from the Albuquerque address in June 1993.

88240 (the Hobbs address).  Respondent did not post the Hobbs address to respondent's computer records until December 25, 1995.

Petitioner did not receive the 30-day letter.

On March 29, 1996, the Austin Service Center mailed a notice of deficiency to petitioner at both the Hobbs address and the Albuquerque address.  The notice of deficiency determined a deficiency in petitioner's income tax and additions to tax in the same amounts, and on the same basis, as proposed in the 30-day letter.  Thus, the notice of deficiency determined a deficiency in petitioner's income tax for the taxable year 1993 in the amount of $377,365 and additions to tax in the amounts of $94,341.25 under section 6651(a) and $15,809.68 under section 6654(a).[6]

Petitioner received the notice of deficiency shortly after it was mailed to her.[7]  Petitioner promptly contacted an IRS representative at the "800" number set forth on the notice of deficiency.  Petitioner explained that the amounts reported on the Forms 1099-G referred to a single debt owed by petitioner to Moncor Bank and that such debt was discharged by the bankruptcy

---

[6] The notice of deficiency also advised petitioner that she was liable for interest (calculated through Dec. 20, 1995) in the amount of $74,934.  Thus, according to the notice, the total amount due from petitioner (calculated through Dec. 20, 1995) was $562,450.

[7] Petitioner received the copy of the notice of deficiency that was mailed to her at the Hobbs address.  The other copy was returned to respondent by the Postal Service as undeliverable.

court in September 1986.  The IRS representative told petitioner that petitioner needed to "respond" to the notice of deficiency in order to "correct the problem" and avoid assessment of the deficiency, additions to tax, and interest.

Thereafter, petitioner contacted her accountant and asked him to resolve the matter for her.  The accountant ultimately advised petitioner to retain a lawyer.

Petitioner contacted several lawyers but ultimately decided to retain Leland Franks (petitioner's counsel).

On May 29, 1996, petitioner's counsel telephoned the Austin service center and spoke with Molly Ramirez (Ms. Ramirez), a tax examiner.  Petitioner's counsel advised Ms. Ramirez that the notice of deficiency erroneously determined income for 1993 in respect of the Moncor Bank debt that had been discharged in bankruptcy in September 1986.  Immediately following the conversation, petitioner's counsel faxed two documents to Ms. Ramirez:  (1) a Form 2848 (Power of Attorney and Declaration of Representative) authorizing petitioner's counsel to represent petitioner before the IRS, and (2) the Final Decree from petitioner's bankruptcy proceeding.[8]

---

[8] The fax log report generated by petitioner's counsel's fax machine indicates that the Final Decree was in fact transmitted to Ms. Ramirez.  Respondent's counsel states that a copy of the Final Decree was not received by Ms. Ramirez.  However, in view of the fact that Ms. Ramirez never contacted petitioner's counsel to advise that she had not received all of the documents that had been transmitted, and because respondent's counsel's statement is unsupported in the record, we do not accept it.

On or about June 5, 1996, petitioner mailed to the Court a petition for redetermination (the petition) in respect of the notice of deficiency.  The petition was received and filed by the Court on June 12, 1996.

In the petition, petitioner alleged, in part, that the Forms 1099-G were duplicates of a single indebtedness owed by petitioner and that such indebtedness had been discharged in petitioner's prior bankruptcy case.

At the time that the petition was filed, petitioner's net worth did not exceed $2,000,000.

On June 18, 1996, petitioner's counsel contacted Pat Joiner, an employee of the FDIC, and requested a letter explaining the Forms 1099-G that had been sent to petitioner.

On June 19, 1996, Marsha Kish (Ms. Kish), a tax examiner at the Austin service center to whom petitioner's case had been assigned, contacted petitioner's counsel.  Petitioner's counsel explained that the discharge of indebtedness reflected on the Forms 1099-G represented a single debt incurred by petitioner to Moncor Bank and that this debt was discharged in bankruptcy in September 1986.  Petitioner's counsel told Ms. Kish that he had requested the FDIC to send him a letter explaining the Forms 1099-G.  Ms. Kish asked petitioner's counsel to send her a copy of such letter as soon as possible; petitioner's counsel agreed to forward her a copy upon receipt.

Also on June 19, 1996, petitioner's counsel faxed Ms. Kish a copy of the Discharge of Debtor that the bankruptcy court had issued in September 1986 and a copy of the bankruptcy schedule on which petitioner had set forth all of her liabilities. On the fax transmittal page, petitioner's counsel directed Ms. Kish's attention to the Moncor Bank debt.

As of July 3, 1996, Ms. Kish had not received a copy of the anticipated FDIC letter. On that date she telephoned the office of petitioner's counsel and stated that she was unable to retain the file in petitioner's case any longer. Ms. Kish then transferred the file so that it would be available to respondent's District Counsel office in Phoenix, Arizona, for preparation of an answer to the petition.

On July 22, 1996, respondent filed an answer (the answer). In the answer, respondent denied all of the substantive allegations made in the petition.

As of August 9, 1996, petitioner's counsel had not received the FDIC letter that he had requested on June 18, 1996. Accordingly, petitioner's counsel telephoned Pat Joiner and again requested that the FDIC send him a letter explaining the relationship of the Forms 1099-G to the Moncor Bank debt.

On August 12, 1996, petitioner's counsel sent a letter to Alfonso Romero (Mr. Romero), the Appeals Officer in respondent's Appeals Office in Albuquerque, New Mexico, to whom petitioner's case had been assigned. Petitioner's counsel attached to his

letter copies of the Discharge of Debtor, the bankruptcy schedule on which petitioner had set forth all of her liabilities, the Forms 1099-G, and the letters dated January 28, 1994, from the FDIC.

On August 14, 1996, petitioner's counsel received a communication dated August 9, 1996, from the FDIC regarding the relationship of the Forms 1099-G to the Moncor Bank debt. The FDIC communication, in the form of a "Corrected Paid Information Statement", confirmed that indebtedness in the amount of $251,203.73 was discharged in 1993 and that such indebtedness related to Moncor Bank. The FDIC letter offered no explanation why petitioner had received four Forms 1099-G; it offered no explanation why petitioner had received those forms more than 7 years after the Moncor Bank debt had been discharged in bankruptcy; and it offered no explanation why 1993 was identified as the year in which the indebtedness was discharged.[9]

Attached to the FDIC communication was a "corrected" Form 1099-C (Cancellation of Debt) for the taxable year 1995 that had been altered by hand to reference the taxable year 1993. That

_____

[9] The FDIC first became subject to the reporting requirements relating to the cancellation of indebtedness in 1993. See sec. 6050P, as enacted by sec. 13252(a), Omnibus Budget Reconciliation Act of 1993 (OBRA), Pub. L. 103-66, 107 Stat. 312, 531-532. Insofar as the FDIC was concerned, reporting was only required in respect of indebtedness discharged after Aug. 10, 1993, the date of OBRA's enactment. OBRA sec. 13252(d)(2), 107 Stat. 532. Prior to the enactment of sec. 6050P, the FDIC did not report the cancellation of indebtedness. H. Conf. Rept. 103-213, 1993-3 C.B. 393, 549.

form showed that a debt in the amount of $251,203.73 was canceled in 1993. That form also identified: (1) The creditor as the FDIC (as receiver for Moncor Bank); (2) the creditor's EIN as 85-0096874; (3) the debtor as Eifert's Fashions & Shoes/Carolyn Sue Eifert: and (4) the account number as 2495-00018627-1.

By letter dated August 16, 1996, petitioner's counsel sent Mr. Romero a copy of the FDIC communication dated August 9, 1996.

By letter dated August 26, 1996, Mr. Romero sent petitioner's counsel a form of decision for the latter's review and signature. The form of decision provided that petitioner was not liable for any deficiency in income tax or additions to tax for the taxable year 1993.

Upon receipt, petitioner's counsel promptly signed the form of decision and, by letter dated August 29, 1996, returned it to Mr. Romero.

A supervisor in respondent's District Counsel office in Phoenix, Arizona, signed the form of decision on October 8, 1996. The form of decision was then mailed to the Court in Washington, D.C.

On October 16, 1996, the Court entered a decision in this case (the decision) utilizing the form of decision furnished by the parties.

On November 8, 1996, petitioner submitted her motion for costs.[10] Thereupon, by Order dated November 19, 1996, the Court vacated the decision previously entered and filed the form of decision as a stipulation of settlement. See Rule 232(f).

## OPINION

We apply section 7430 as amended by the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, sec. 6239(a), 102 Stat. 3342, 3743-3746.[11]

Under section 7430(a), a judgment for costs may only be awarded if a taxpayer: (1) Is the "prevailing party"; (2) has exhausted his or her administrative remedies within the IRS with respect to an award of litigation costs; and (3) did not unreasonably protract the proceedings. Sec. 7430(a), (b)(1),

---

[10] In her motion, petitioner prayed for an award of costs in the amount of $4,419.91. Petitioner subsequently revised this amount to include actual costs incurred after the motion was filed. Petitioner now requests an award of costs in the amount of $4,577.22, consisting of the following:

| | |
|---|---|
| Attorney's fees (32.4 hours at $130/hour) | $4,212.00 |
| Filing fee/other costs and expenses | 365.22 |
| | 4,577.22 |

[11] Technical and Miscellaneous Revenue Act of 1988, (TAMRA) Pub. L. 100-647, sec. 6239(d), 102 Stat. 3746 is generally applicable to proceedings commenced after Nov. 10, 1988. TAMRA sec. 6239(d), 102 Stat. 3746. Congress amended sec. 7430 most recently in the Taxpayer Bill of Rights 2 (TBOR2), Pub. L. 104-168, secs. 701-704, 110 Stat. 1452, 1463-1464. However, the amendments made by TBOR2 apply only in the case of proceedings commenced after July 30, 1996. TBOR2 secs. 701(d), 702(b), 703(b), and 704(b), 40 Stat. 1463-1464. Inasmuch as the petition was filed on June 12, 1996, the amendments made by TBOR2 do not apply in the present case.

(4).  A taxpayer must satisfy each of these three requirements in order to be entitled to a judgment under section 7430.  Rule 232(e).

I. Prevailing Party

In order to qualify as the "prevailing party", a taxpayer must establish: (1) The position of the United States in the proceeding was not substantially justified; (2) the taxpayer has substantially prevailed with respect to the amount in controversy or the most significant issue or set of issues presented; and (3) the taxpayer satisfies the applicable net worth requirement.  Sec. 7430(c)(4)(A).

Respondent concedes that petitioner substantially prevailed with respect to the amount in controversy.  See sec. 7430(c)(4)(A)(ii)(I).  However, respondent contends that the position taken by respondent in both the administrative and court proceedings was substantially justified.  Respondent also contends that petitioner must prove that she satisfies the applicable net worth requirement.

A.   Respondent's Position in the Administrative and Court Proceedings

Petitioner bears the burden of proving that respondent's position in the administrative and court proceedings was not substantially justified.  Rule 232(e); Dixson Corp. v. Commissioner, 94 T.C. 708, 714-715 (1990); Ganter v.

Commissioner, 92 T.C. 192, 197 (1989), affd. 905 F.2d 241 (8th Cir. 1990).

Whether respondent's position is substantially justified is a question of fact. We resolve such issue by the application of a reasonableness standard. See Pierce v. Underwood, 487 U.S. 552, 565 (1988) (construing similar language in the Equal Access to Justice Act (EAJA), 28 U.S.C. sec. 2412 (1988)); see also Sokol v. Commissioner, 92 T.C. 760, 763 n.7 (1989); Sher v. Commissioner, 89 T.C. 79, 84 (1987), affd. 861 F.2d 131 (5th Cir. 1988). In considering the reasonableness of respondent's position, we take into account what respondent knew at the time that she took the position based on the information available to her at that time. See Rutana v. Commissioner, 88 T.C. 1329, 1334 (1987).

As relevant herein, the position of the United States that must be examined against the substantial justification standard with respect to the administrative proceeding is the position taken by the Commissioner as of the date of the notice of deficiency. Sec. 7430(c)(7)(B)(ii). The position of the United States that must be examined against the substantial justification standard with respect to the court proceeding is the position taken by the Commissioner in her answer to the petition. Bertolino v. Commissioner, 930 F.2d 759, 761 (9th Cir. 1991); Sher v. Commissioner, 861 F.2d 131, 134-135 (5th Cir. 1988), affg. 89 T.C. 79 (1987); see sec. 7430(c)(7)(A).

In this case, respondent's position on each of these dates was the same.  More specifically, until Mr. Romero conceded the case in response to the FDIC communication dated August 9, 1996, the position of respondent was that the discharge of indebtedness reported on the information returns filed with respondent represented taxable income to petitioner.

(1) The Administrative Proceeding

We begin with petitioner's contention that respondent's position was not substantially justified at the time that the notice of deficiency was issued.  Respondent contends to the contrary.  We agree with petitioner.

Our conclusion that respondent's position was not substantially justified at the time that the notice of deficiency was issued is not based on any one particular factor; rather, our conclusion is based on the totality of the facts and circumstances present in this case.  The following facts and circumstances are those that we think are particularly significant in cumulatively tipping the scales in petitioner's favor.

The deficiency determined by respondent in the notice of deficiency is predicated on an adjustment to income in the amount of $1,009,815.  Virtually all of this amount, i.e., $1,004,812, represents discharge-of-indebtedness income.  Such discharge-of-indebtedness income originates from four Forms 1099-G, each of which is for the exact same amount, i.e., $251,203.  Under these

circumstances, respondent should have regarded the Forms 1099-G with skepticism.

In addition, the Forms 1099-G showed the payor as the FDIC in combination with different financial institutions having different EINs, notwithstanding the fact that each Form 1099-G reported exactly the same amount of income. Again, respondent should have regarded such forms with skepticism.

Moreover, two of the four Forms 1099-G were "corrected" forms. At the very least, this fact constituted evidence of a duplication, and respondent should have regarded the Forms 1099-G with skepticism.

We also think that respondent should have taken into account the identity of the issuer of the Forms 1099-G and the character of the "income" reported therein. First, box 5 of Form 1099-G was used to report discharge of indebtedness by a Federal government agency. There is nothing in the record to suggest why respondent, the Commissioner of Internal Revenue, could not have contacted the Federal government agency that issued the Forms 1099-G in order to determine the basis on which such forms were issued given the dubious nature of such forms.

Second, section 108(a)(1) excludes from gross income an amount otherwise includable therein if the discharge of indebtedness occurs in a bankruptcy case or when the taxpayer is insolvent. Indeed, the "Instructions for Recipient" for box 5 of Form 1099-G expressly acknowledged this provision. Again, there

is nothing in the record to suggest why respondent could not have contacted the FDIC in order to determine the basis on which the Forms 1099-G were issued given the dubious nature of such forms.

Further, respondent issued the notice of deficiency after only one attempt to contact petitioner. We again take note of the fact that the notice determined a million dollar adjustment to petitioner's income. As a consequence of this million dollar adjustment, the notice determined a deficiency in petitioner's income tax in the amount of $377,365, and additions to tax under sections 6651(a) and 6654(a) in the amounts of $94,341.25 and $15,809.68, respectively. The notice also advised petitioner that she was liable for interest (calculated through December 20, 1995) in the amount of $74,934. Thus, according to the notice, the total amount due from petitioner (calculated through December 20, 1995) was $562,450. Given a liability of this magnitude, and in view of the dubious nature of the Forms 1099-G, we question whether respondent should have issued the notice of deficiency after making only one attempt to contact petitioner.

Indeed, we take note of the fact that respondent originally proposed the liability of $562,450 in the 30-day letter that was sent to petitioner in November 1995. Again, given the magnitude of such liability, and in view of the dubious nature of the Forms 1099-G, we question whether respondent should have even proposed

such a liability without first attempting to contact petitioner.[12]

In view of the foregoing, we conclude that it was unreasonable for respondent, in the context of this case and without further investigation, to determine a million dollar adjustment to petitioner's income. We therefore hold that respondent's position was not substantially justified at the time that the notice of deficiency was issued.

(2) The Court Proceeding

We also hold that respondent's position was not substantially justified at the time that the answer was filed. Again, our holding is based on the totality of the facts and circumstances present in this case. In addition to the factors that we have already discussed, the facts and circumstances that support our holding are as follows:

Shortly after receiving the notice of deficiency, petitioner contacted an IRS representative at the "800" number set forth on the notice of deficiency and explained that the amounts reported on the Forms 1099-G referred to a single debt and that such debt was discharged in a bankruptcy proceeding in September 1986.

---

[12] In any event, we suspect that if respondent had processed petitioner's 1994 income tax return more promptly, petitioner would have received and responded to the 30-day letter. Here it should be recalled that petitioner listed the Hobbs address on her 1994 income tax return, and that respondent did not post the Hobbs address to respondent's computer records until after the 1994 return had been processed.

The IRS representative told petitioner that petitioner needed to "respond" to the notice of deficiency in order to "correct the problem".

In May 1996, petitioner's counsel spoke with Ms. Ramirez and advised her that the notice of deficiency erroneously determined income for 1993 in respect of a debt that had been discharged in bankruptcy in September 1986. Petitioner's counsel also transmitted by facsimile: (1) A power of attorney authorizing him to represent petitioner before the IRS; and (2) the Final Decree from petitioner's bankruptcy proceeding. Ms. Ramirez took no action, but waited instead for petitioner's counsel to furnish additional evidence.

Despite the foregoing contacts and the information furnished by petitioner and petitioner's counsel, as well as the infirmities evident on the face of the Forms 1099-G, and notwithstanding the fact that the statute of limitations on assessment for 1993 had not yet even begun to run, see sec. 6501(c)(3), respondent did not offer to rescind the notice of deficiency. See sec. 6212(d).

After petitioner filed the petition but before respondent filed the answer, petitioner's counsel transmitted to Ms. Kish a copy of the Discharge of Debtor that the bankruptcy court had issued in September 1986 and a copy of the bankruptcy schedule on which petitioner had set forth all of her liabilities, specifically including the Moncor Bank debt. Petitioner's

counsel directed Ms. Kish's attention to the latter. Nevertheless, Ms. Kish took no action, and instead transmitted the file, presumably including the foregoing documents, to respondent's District Counsel office for preparation of the answer.

When respondent filed the answer in July 1996, respondent should have been aware of all of the infirmities, as previously described, that were evident on the face of the Forms 1099-G. Respondent should also have been aware of petitioner's position that the Forms 1099-G related to a single debt that had been discharged by the bankruptcy court in September 1986. Indeed, respondent's administrative file should have included the operative documents related to petitioner's bankruptcy case. Nevertheless, respondent denied all of the substantive allegations made in the petition and thereby permitted this case to proceed.

Finally, we observe that respondent did not concede this case until after petitioner's counsel furnished the FDIC communication dated August 9, 1996. Although the FDIC communication did confirm the existence of indebtedness owed by petitioner to Moncor Bank, the FDIC continued to maintain that indebtedness in the amount of $251,203.73 was discharged in 1993. We question, therefore, whether the FDIC communication was actually the definitive piece of evidence that "allowed" respondent to concede.

B.  <u>Petitioner's Net Worth</u>

The record demonstrates that petitioner satisfies the applicable net worth requirement of sec. 7430(c)(4)(A)(iii). Here we note that petitioner attached to her motion for costs an affidavit averring that she satisfied such net worth requirement. Petitioner subsequently furnished an additional affidavit in which she set forth her assets and liabilities.  Respondent has never challenged or otherwise questioned either of petitioner's affidavits.

Based on petitioner's affidavits, as well as the record as a whole, we have found as a fact that petitioner's net worth did not exceed $2,000,000 at the time that the petition was filed. We therefore hold that petitioner satisfies the applicable net worth requirement.

C.  <u>Conclusion</u>

In view of the foregoing, we hold that petitioner was the prevailing party in both the administrative and court proceedings.

II.  <u>Exhaustion of Administrative Remedies</u>

Respondent contends that petitioner failed to exhaust administrative remedies because petitioner failed to appeal the proposed deficiency to the IRS Appeals Office as stated in the 30-day letter.  We disagree.

The short answer to respondent's contention is that petitioner never received the 30-day letter because the letter

was sent to an address where petitioner no longer lived.[13] We infer that petitioner would have appealed the proposed deficiency if petitioner had known about it. Taking into account the fact that petitioner did not receive the 30-day letter, we reject respondent's contention that petitioner failed to exhaust administrative remedies. See sec. 301.7430-1(e)(2), Proced. & Admin. Regs.

III. Protraction of Proceedings

Respondent contends that petitioner unreasonably protracted the court proceeding because petitioner failed to provide "relevant information immediately after the issuance of the Notice of Deficiency". In respondent's view, if petitioner had provided such information, then respondent could have rescinded the notice of deficiency.

As previously discussed, respondent did not offer to rescind the notice of deficiency in spite of (1) the infirmities evident on the face of the Forms 1099-G, and (2) the information furnished by petitioner and petitioner's counsel after the notice was issued. Thus, we reject respondent's contention that petitioner unreasonably protracted the court proceeding.

IV. Reasonableness of the Amount of Costs Claimed

---

[13] See supra note 12.

In her motion, petitioner prays for an award of costs in the amount of $4,577.22.[14]  Respondent suggests that an award of attorney's fees at a rate in excess of $75 per hour (plus the appropriate COLA) would be unreasonable.  Respondent does not suggest that the number of hours billed by petitioner's counsel is unreasonable, nor does respondent suggest that the other costs and expenses that petitioner seeks to recover are either unrecoverable or unreasonable in amount.

Section 7430(c)(1) defines reasonable costs, in part, as reasonable fees paid or incurred for the services of attorneys in connection with the administrative and court proceedings.  Section 7430(c)(1)(B)(iii) limits the hourly rate for attorney's fees to $75, with allowances for an increase in the cost of living and other special factors.

This Court's position is that the cost of living adjustment (COLA) applicable to an award of attorney's fees should be measured from October 1, 1981, i.e., the same date from which COLA's are measured under the EAJA.  Bayer v. Commissioner, 98 T.C. 19 (1992); see Harris v. Railroad Retirement Board, 990 F.2d 519, 521 (10th Cir. 1993)(applying the EAJA analogously).  Inasmuch as petitioner's counsel billed petitioner at the rate of $130 per hour for 1996 and 1997, we award petitioner attorney's

---

[14] See supra note 10 for the breakdown of this amount.

fees at that rate. See <u>Austin v. Commissioner</u>, T.C. Memo. 1997-157, (slip op. at 24).

V. <u>Conclusion</u>

In summary, we hold that petitioner qualifies as a "prevailing party" within the meaning of section 7430(c)(4)(A) and that she is entitled to an award of costs under section 7430 in the amount of $4,577.22.

In order to reflect the foregoing,

<u>An appropriate order and decision will be entered for petitioner</u>.