Matter of Dynamic Logic, Inc. v Tax Appeals Trib. of the State of New York (2025 NY Slip Op 02262)

Matter of Dynamic Logic, Inc. v Tax Appeals Trib. of the State of New York

2025 NY Slip Op 02262

Decided on April 17, 2025

Court of Appeals

Cannataro, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 17, 2025

No. 35 

[*1]In the Matter of Dynamic Logic, Inc., Appellant,
v
Tax Appeals Tribunal of the State of New York et al., Respondents.

Leah Robinson, for appellant.
Frederick A. Brodie, for respondents.

CANNATARO, J.

Petitioner Dynamic Logic Inc. (Dynamic) challenges the determination of respondent Tax Appeals Tribunal upholding the imposition of sales tax on its AdIndex service. Because AdIndex represents "the furnishing of information," and information contained in AdIndex reports is "substantially incorporated in reports furnished to other persons" (Tax Law § 1105 [c] [1]), the determination of the Tax Appeals Tribunal that the tax was properly imposed was supported by the record and the judgment of the Appellate Division should be affirmed.
*
* *
Dynamic markets products to help clients measure the effectiveness of their advertising campaigns. At issue here is one such product, AdIndex, which Dynamic describes as using "a control/exposed methodology to measure the effectiveness of digital advertising at communicating brand messaging." To create an AdIndex report, Dynamic identifies individuals who have been exposed to a client's advertisements and then surveys them along with a control group. The survey questions are largely standardized but may contain a small number of campaign-specific questions. The results are compared to broader market data contained in MarketNorms, a database maintained by Dynamic that is also available to clients as a standalone subscription service. Dynamic then generates a report for the client which includes the survey data collected, an analysis of the "story" the data tells, as well as client-specific "insights," "implications," "next steps" and "recommendations" gleaned from the data. The data gathered in each AdIndex report is later incorporated into the MarketNorms database for use in reports prepared for future clients.
In 2014, the Commissioner of Taxation and Finance audited Dynamic, concluded that the AdIndex product represented a taxable information service under Tax Law § [*2]1105 (c) (1), and assessed additional sales tax. Dynamic challenged the assessment before the Division of Tax Appeals which sustained the imposition of the tax after an evidentiary hearing. Dynamic then appealed to the Tax Appeals Tribunal, which upheld the Division's determination. The Tribunal concluded that AdIndex's primary function was "the collection and analysis of information." Further, the Tribunal found that any recommendations that were included in the AdIndex product were "ancillary to the data collection and analysis" as they were "drawn directly from the data." Finally, the Tribunal determined that Dynamic was not entitled to an exclusion under Tax Law § 1105 (c) (1), based on its finding that the data collected for each AdIndex report was furnished to other persons through its subsequent incorporation into the MarketNorms database, which in turn was used in AdIndex reports created for other clients.
Dynamic brought this CPLR article 78 petition in the Appellate Division seeking to annul the Tribunal's determination pursuant to Tax Law § 2016. That Court unanimously confirmed the determination and dismissed the petition, holding that the Tribunal had rationally determined that AdIndex was an information service and that there was substantial evidence supporting its reasoning (see 224 AD3d 1184, 1189 [3d Dept 2024]). The Court further held that the Tribunal rationally concluded that the information provided through AdIndex was substantially incorporated into reports furnished to other persons and that Dynamic was therefore not entitled to the exclusion contained in Tax Law § 1105 (c) (1).
We granted Dynamic leave to appeal (41 NY3d 910 [2024]) and now affirm.
*
* *
We must uphold the Tribunal's determination if it is "rational" and "supported by substantial evidence" (Matter of Great Lakes-Dunbar-Rochester v State Tax Commn., 65 NY2d 339, 343 [1985]). "Applying the substantial evidence standard, the question is not whether the reviewing court finds the proof convincing, but whether the agency could do so" (Black v New York State Tax Appeals Trib., 41 NY3d 131, 144 [2023] [internal quotation marks and alterations omitted]). As a matter of practical application, this means that "if there are any facts or reasonable inferences from the facts to sustain it, [the reviewing court] must confirm the Tribunal's determination" (Matter of Wegmans Food Mkts., Inc. v Tax Appeals Trib. of the State of N.Y., 33 NY3d 587, 594 [2019] [internal quotations and citation omitted]).
Tax Law § 1105 (c) (1) imposes a tax on:
"The furnishing of information by printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner, including the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons, but excluding the furnishing of information which is personal or individual in nature and which is not or may not be substantially incorporated in reports furnished to other persons. . . ."
Because the parties concede that the information was personal and individual in nature, the question of whether a sales tax was properly imposed on Dynamic's AdIndex product boils down to two determinative statutory issues: (1) whether the service represents the "furnishing of information" and, (2) whether the information is "substantially incorporated in reports furnished to other persons" (Tax Law § 1105 [c] [1]).
Turning to the first issue, under well-settled law, this Court must construe Tax Law § 1105 (c) (1) in such a way as "to insure the collection of all designated taxes where a supportable theory can be found" (Matter of 1605 Book Ctr. v Tax Appeals Trib. of State of N.Y., 83 NY2d 240, 244 [1994], cert denied 513 US 811 [1994]). Tax Law § 1105 (c) (1) imposes a tax on any service which furnishes "information by printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner, including the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons" (emphasis added). As the Tribunal found, the reports generated by AdIndex fit comfortably within this definition as their primary function is the collection and analysis of information. To the extent that recommendations or advice are included in the reports, there was evidence in the record to support the Tribunal's determination that those features are ancillary to the core purpose of the product, which is data analysis. Accordingly, there is ample support for the Tribunal's determination that AdIndex is a taxable "information service" under Tax Law § 1105 (c) (1).
The second issue—whether the information contained in the reports is "substantially incorporated in reports furnished to other persons"—pertains to whether the AdIndex service qualifies for an exclusion under section 1105 (c) (1). Once a taxpayer has been properly subjected to a tax, they bear the burden of establishing that an exclusion applies and must overcome a presumption in favor of the taxing power (see Matter of Mobil Oil Corp. v Finance Admr. of City of N.Y., 58 NY2d 95, 99 [1983]).
Resorting to dictionary definitions, Dynamic asserts that, in order to be substantial, data must be incorporated "to a great extent or degree" into subsequent reports. The Tribunal found, however, that so long as information collected from each AdIndex report is blended thoroughly with existing data incorporated into subsequent reports and represents a valuable addition to them, the product does not qualify for the statutory exclusion. Despite the parties' stark disagreement over the interpretation of this operative term, the dissent characterizes the statutory language as "clear and unambiguous" (dissenting op at 12). But the statute is not so clear. As the parties' competing interpretations demonstrate, "substantiality" can have different meanings turning, at least in this case, on whether one views the term as a qualitative or quantitative descriptor [FN1]. We conclude that the Tax Tribunal's application of the statutory exclusion in this context was reasonable.
By way of analogy, the Supreme Court of the United States has interpreted the term "substantially justified" as meaning not "justified to a high degree," but "justified in substance. . . " or "justified to a degree that could satisfy a reasonable person" (Pierce v Underwood, 487 US 552, 564-565 [1988]). Similarly, in the context of substantial
evidence, we have interpreted "substantial" to be a "minimal" requirement, or "less than a preponderance" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045-1046 [2018] [internal quotation marks and citations omitted]). In the area of rulemaking, the Federal Rules of Civil Procedure allow for the resistance of discovery demands where it is "substantially justified" (Fed. R. Civ. Proc. 37[a][5]) and then defines that term as not "justified to a high degree" but simply as a level of justification creating a "genuine dispute" whether the discovery is required (see 8 C. Wright & A. Miller, Fed. Prac. and Proc. § 2288, p.790 [1970]). Finally, in 1965 when Tax Law § 1105 (c) (1) was first enacted, Black's Law Dictionary defined the term "substantial" as "of real worth and importance; valuable," and as something "worth while as distinguished from something without value or merely nominal" notably focusing on underlying qualitative value (Substantial, Black's Law Dictionary, 4th Ed. at 1597 [1951]). The use of "substantiality" in these other contexts supports the Tribunal's less exacting definition here.
Applying that more prevalent definition of "substantial" to this appeal, the Tribunal's determination that the AdIndex data was substantially incorporated into subsequent reports furnished to others was reasonable. Indeed, every AdIndex report contains benchmark data, which, in turn, contains a meaningful amount of data generated from prior AdIndex reports. This reincorporation of data represents an appreciable portion of each subsequent report, without which there would be no ability to compare a client's campaign to any baseline data—a feature of the reports which Dynamic promotes to potential clients. And although it is true that information from prior AdIndex reports makes up a relatively small portion of each subsequent report (see dissenting op at 8) that reincorporation is qualitatively important to the analytical value of that report rendering it "substantial."
Alternatively, even if we were to accept Dynamic's definition of "substantially incorporate" as meaning incorporation "to a great extent or degree," it would still not be unreasonable for the Tribunal to conclude that the AdIndex product did not qualify for the exclusion contained in Tax Law § 1105 (c) (1) as much of the data generated for each report is incorporated into the MarketNorms database, which Dynamic separately markets and sells as an independent product (see Matter of Rich Prods. Corp. v Chu, 132 AD2d 175, 177-178 [3d Dept 1987] [holding that unique reports generated from same database "substantially incorporated" information that was likely furnished onto others]). Therefore, the Tribunal's determination that the inclusion of the information originally generated for individual clients into products eventually sold to others meets the level of substantiality under section 1105 (c) (1) is reasonable and supported by substantial [*3]evidence (see Matter of Grace v New York State Tax Commn., 37 NY2d 193, 195-196 [1975]).[FN2]
Accordingly, the judgment of the Appellate Division should be affirmed, with costs.

TROUTMAN, J. (dissenting):

"[T]he majority today declares a new rule: in New York, the taxpayer always loses"
-Matter of Wegmans Food Mkts., Inc. v Tax Appeals Trib. of the State of N.Y. (33 NY3d 587, 596 [2019] [Stein, J., concurring]).
Today's decision proves that Judge Stein was in no way being "hyperbolic" when she made that pronouncement in her concurrence in Matter of Wegmans Food Mkts., Inc. v Tax Appeals Trib. of the State of N.Y. (33 NY3d at 592). Wegmans was the last time this Court had the opportunity to analyze Tax Law § 1105 (c) (1), "which imposes a tax on '[t]he receipts from every sale' of '[t]he furnishing of information by printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner, including the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons' " (id. at 594). Nearly six years later, nothing has changed. The taxpayer still loses.
At issue in Wegmans was a statutory exclusion contained in section 1105 (c) (1) protecting from taxation "the furnishing of information which is personal or individual in nature and which is not or may not be substantially incorporated in reports furnished to [*4]other persons" (Tax Law § 1105 [c] [1]). The present case, however, concerns issues distinct from those addressed in Wegmans—wherein this Court endeavored to construe the meaning of the term "personal or individual" in the first clause of the exclusion. Here, the dispute concerns the meaning of the second clause of the exclusion: "the furnishing of information . . . which is not or may not be substantially incorporated in reports furnished to other persons" (id.).
Unlike here, however, the Wegmans Court also had to rule on the proper standard of review for courts construing statutory exclusions to tax laws. One concurring and two dissenting judges sharply disagreed with the majority's jettisoning of "the rule of construction that requires exclusions from taxation to be strictly interpreted in the taxpayer's favor" (Wegmans, 33 NY3d at 596 [Stein, J., concurring]; see id. at 602-603 [Fahey, J., dissenting]; see also id. at 622 [Wilson, J., dissenting]). Although I agree with both the concurrence and dissents on that point, the doctrine of stare decisis counsels against relitigating that issue at this time.
As it stands, it is not necessary for me to rehash that debate on this appeal. The clause of the exclusion at issue here is both plain and unambiguous. Unfortunately, the majority overlooks the text and promotes an interpretation of the exclusion unmoored from both its text and history. Said another way, the majority construes the exclusion in a manner that the legislature plainly never intended, leaving the taxpayer to lose again.
I dissent.
I.
Tax Law § 1105 (c) (1) imposes sales tax on
"[t]he furnishing of information by printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner, including the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons, but excluding the furnishing of information which is personal or individual in nature and which is not or may not be substantially incorporated in reports furnished to other persons" (emphasis added).
This provision is incorporated in article 28 of the Tax Law. "Enacted in 1965, article 28 of the Tax Law was drafted to provide a broad base State sales tax including charges and sales of services then largely exempt from local sales taxation" (American Locker Co. Inc. v Gallman, 32 NY2d 175, 178 [1973]). In particular, as set forth in then-Judge Wilson's dissent in Wegmans, section 1105 (c) (1) is modeled after a New York City local law enacted to tax "information services whose published reports had been excluded from the existing tax on retail sales of personal property by a landmark decision of this Court: Dun & Bradstreet, Inc. v City of New York (276 NY 198 [1937])" (Wegmans, 33 NY3d at 616 [Wilson, J., dissenting]).
"There, New York City sought to tax a 'mercantile agency which furnishes to its subscribers information respecting the [*5]financial standing of persons engaged in business' compiled in reference books. The City reasoned that the books were goods, and thus were subject to the City's 'tax on the sale of tangible personal property.' We disagreed, in part because the City's sales tax included a specific section for services and in that section taxed only certain utility services (implying that all other services were excluded from taxation), and in part because information services that generated personal property did not constitute the sale of personal property" (id. at 616-617).
The purpose of section 1105 (c) (1), and the local law upon which it was modeled, was to impose a sales tax on information services by taxing "the sale of tangible personal property" of the sort this Court disallowed in Dun & Bradstreet (276 NY at 202; see Wegmans, 33 NY3d at 617-618 [Wilson, J., dissenting]). Notably, the Department of Taxation and Finance agrees that section 1105 (c) (1) does not impose sales tax on information services furnished orally (see 20 NYCRR 527.3 [b] [3]).
II.
I focus my dissent solely on the statutory exclusion set forth explicitly in section 1105 (c) (1). Read as whole, the legislature unambiguously excluded from taxation under section 1105 (c) (1), "the furnishing of information which is personal or individual in nature and which is not or may not be substantially incorporated in reports furnished to other persons" (Tax Law § 1105 [c] [1]). Here, the issue is whether the reports petitioner furnished to its clients constituted "the furnishing of information . . . which is not or may not be substantially incorporated in reports furnished to other persons" (Tax Law § 1105 [c] [1]).
Although the statute does not define the terms "furnished" or "substantially incorporated," their meanings can be readily inferred from their context, as the Department of Taxation and Finance did when it published its regulations containing examples of when the exclusion applies:
"The sales tax does not apply to the receipts from the sale of information which is personal or individual in nature and which is not or may not be substantially incorporated into reports furnished to other persons by the person who has collected, compiled or analyzed such information.
* * *
"Example 3: A computer service company has a program consisting of withholding tax tables. Using the same program, it computes the payroll for several subscribers. The fee charged to each subscriber is not taxable as it is for an information service, the results of which are not incorporated into reports furnished others.
"Example 4: A firm is in the business of reading newspapers and periodicals, cutting out all articles in which the name of a customer or a topic of interest to the customer appears, and transferring such clippings to the customer, whether by mail or otherwise, for a fee. This is a service of furnishing information which is taxable. The tax is due on the entire charge regardless of the method of billing for the service, including any charge by the firm for shipping or delivery of the clippings to the customer. Even though this information may be individual in nature, it may be incorporated in reports furnished to others" (20 NYCRR 527.3 [b]).
What these examples illustrate is that, in determining what falls under the exclusion, one should look at the report that is actually furnished to the customer and determine based on what appears on that report whether it may be incorporated in reports furnished to others. It is not the information used to create the reports that is important. What is important is whether the specific information furnished to one customer may be substantially incorporated in reports furnished to others. Given these examples, especially example 3, it is puzzling that the Department ever sought to impose a tax on the product at issue in this proceeding: AdIndex.
III.
AdIndex is a service sold by petitioner to help advertisers, advertising agencies, and media companies improve the effectiveness of their advertising campaigns. Through this service, petitioner creates an individualized study to evaluate the efficacy of a client's particular digital advertising campaign for a particular product. These studies culminate in a written report and an hour-long oral presentation given exclusively to the client. The report and presentation inform AdIndex's client how the campaign performed and what changes the client can make to get more "bang for the buck."
Each AdIndex study begins with a survey designed specifically for the individual client's campaign. Petitioner considers responses it obtained from people who have been exposed to an advertisement and people who have not, and it analyzes their answers to gauge differences in their awareness of the brand, their understanding of the value of the product or what it is used for, their opinions about the brand or product, and their likelihood of making a purchase. By comparing answers from survey respondents who have seen the advertisement with those who have not, petitioner draws conclusions about the campaign's impact on the public.
Each survey includes questions customized to the advertising campaign being studied. An AdIndex "Dash" study could have up to seven customized, campaign-related, questions. Whereas, an AdIndex "Premium" study could have up to 21 customized questions. In addition to those customized questions, every survey includes eight standard questions related to age, gender, income, and high-level awareness of the brand. Typically, it takes petitioner two to three weeks to develop a survey and six to eight weeks to conduct it.
After the survey is completed, petitioner's employees analyze the data. They then formulate opinions, advice, and recommendations based on the data and draft a written report. This is all done by analysts who are experts in digital advertising and possess the education and experience necessary to compare survey results and develop insights and advice for clients about changes to their present or future campaigns. The analysts have college or advanced degrees in fields like psychology, sociology, and economics, which help them understand what influences the decision-making of consumers. It takes typically four weeks from when a survey is completed for the analyst to formulate insights and opinions and draft a final, written report.
The report for each study provides key findings about the advertising campaign's success—such as, the demographics of the people who responded poorly or well to the campaign and the third-party websites on which the client's advertising was most impactful. The reports are typically 25 to 30 slides long, but they can exceed well over 100. Each report includes specific advice and recommendations for how to improve the effectiveness of the campaign going forward. The opinions and advice provided in each report are customized to the particular campaign. And each report is provided only to the client who commissioned it. Petitioner never provides a client's report to anyone else.
Each survey leading to the report contains eight basic questions regarding age, household income, gender, and high-level awareness of a brand, a product of which is the focus of the advertising campaign. Petitioner uses that information to determine the campaign's performance across different demographic targets, and it also includes the answers to those eight questions in a database called MarketNorms. Responses to the customized survey questions, findings, and advice developed by petitioner's analysts—including their written reports—are, however, never uploaded into the MarketNorms database.
Petitioner uses the MarketNorms database to generate "benchmarking," which shows how a broad category of advertising campaigns—such as "financial services," "beauty," or "tourism"—performed on average in the past. All the data in the MarketNorms database is aggregated and anonymized. Clients will never know which prior campaigns were included or any specific information about any of those prior campaigns.
Although the Appellate Division stated erroneously that petitioner's clients could access "raw data" in MarketNorms, that statement conflicts with the Tax Appeals Tribunal of the State of New York's findings of fact, and it lacks support in the record. The Tribunal found that petitioner "may not disclose the data in a manner that identifies the client." Furthermore, the Commissioner conceded below that no raw data is available: admitting that MarketNorms and the benchmarking data contain "only aggregate data and not the underlying raw data."
Generally, each AdIndex report includes one or two slides containing MarketNorms benchmarking data. An AdIndex report may also include one additional slide showing how the benchmarking data should be interpreted, but that slide does not contain any benchmarking data. The MarketNorms data itself does not tell a client anything about how its campaign performed. Instead, it shows a distribution of aggregated performance from prior studies, often in the form of a bell curve. A client's [*6]own performance can be compared with this distribution to determine whether the campaign being studied performed better, worse, or on par with the entire set of prior studies. But the MarketNorms data does not tell the client why its advertising campaign performed better or worse than the aggregate performance of the other studies, does not identify which campaigns were used for comparison, and does not reveal how any one of those campaigns performed individually.
Petitioner's clients could also receive benchmarking data by subscribing directly to the MarketNorms database. Unlike an AdIndex client, a MarketNorms subscriber would only see average performance by industry, without the overlay of how their campaign performed in relation to the average industry performance. Direct subscriptions to MarketNorms accounted for a trivial portion of petitioner's business—there were only 8 MarketNorms subscriptions during the multi-year audit period, compared to 2,223 AdIndex sales.
IV.
In 2016, after an audit, the Department of Taxation and Finance determined that AdIndex was a taxable information service under Tax Law § 1105 (c) (1). The Department assessed nearly $2.3 million in sales taxes against petitioner for its sale of AdIndex services from September 2011 through August 2014. Petitioner challenged the Department's assessment, contending that AdIndex (1) was a "consulting service," not a taxable information service, and (2) was excluded from taxation under Tax Law § 1105 (c) (1) as a service providing "uniquely personal" information that "is not (and cannot be) substantially incorporated into reports furnished to other persons."
The Division of Tax Appeals (Russo, ALJ), denied the petition, concluding that AdIndex's primary function is to collect information regarding the effectiveness of its clients' advertising by conducting surveys, analyzing that information, and furnishing that information and analysis to its clients in reports, a function that "is the very essence of an information service." As to the exclusion from taxation of personal or individual information, the Division agreed with petitioner that the information generated by AdIndex was "personal and individual in nature" because it was derived from private sources, including "patented tracking and survey technology" that required input from the client and from the affected websites.
However, the Division determined that AdIndex did not qualify for the exclusion because its retention of a license to use client data in MarketNorms and the possibility that its clients could choose to share their personal AdIndex data meant that AdIndex data "may be substantially incorporated into reports furnished to others." Petitioner took an exception to that determination.
The Tax Appeals Tribunal affirmed the Division's determination. And the Appellate Division, Third Department, confirmed the Tribunal's determination. The Appellate Division concluded that AdIndex did not qualify for the tax exclusion for information that is not "substantially incorporated" into reports furnished to others because petitioner's clients "could purchase access to the MarketNorms database and the raw data contained therein" and because "MarketNorms data is also used by petitioner to prepare AdIndex reports for its customers" comparing their ad results with industry [*7]benchmarks. Based on this reasoning, the Appellate Division held that the Tribunal rationally "concluded that, because the information incorporated into the MarketNorms database for use in other AdIndex reports was qualitatively valuable to the analysis provided by AdIndex, information from an AdIndex report can fairly be regarded as 'substantially incorporated' into the reports furnished to others" (224 AD3d 1184, 1188).
We granted petitioner leave to appeal.
V.
The majority's first misstep is proceeding as if it is settled law that we always apply a deferential standard when reviewing a taxing authority's construction of statutory exclusions (see majority op at 4). The majority hinges its approach on this Court's decision in Wegmans. But that is not what the Wegmans Court held. What the Court held was that "the presumption is in favor of the taxing power" when construing "ambiguities in statutory exclusions" (Wegmans, 33 NY3d at 593-594 [emphasis added and internal quotation marks omitted]). As petitioner points out, this Court said nothing in Wegmans to overturn the well-settled rule that, "[w]here the language of a statute is clear and unambiguous, courts must give effect to its plain meaning" (Matter of Charter Dev. Co., L.L.C. v City of Buffalo, 6 NY3d 578, 581 [2006]). And, when divining the plain meaning of a statute, "all parts of an act are to be read and construed together to determine the legislative intent" (id. [internal quotation marks omitted], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 97).
If we follow these rules, it becomes apparent what the legislature meant when it excluded from taxation "information which is personal or individual in nature and which is not or may not be substantially incorporated in reports furnished to other persons" (Tax Law § 1105 [c] [1]). The ALJ below determined that AdIndex meets the "personal or individual in nature" portion of the exclusion, and the Commissioner did not contest that finding. Consequently, the question here is whether the information "furnished" in an AdIndex report to one client is or may be "substantially incorporated" into reports "furnished" to subsequent clients.
Notably, the exclusion's language focuses only on the "furnishing of information." As a result, the exclusion looks to whether the end product is substantially incorporated into reports furnished to others. And although the underlying data may be relevant for purposes of determining whether the information is "personal or individual," it is not relevant when determining whether the information furnished may be substantially incorporated into reports furnished to others. The first clause of the exclusion is focused on the output produced by the information service by "printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner . . . " (id.). The second clause of the exclusion is concerned with the information that a customer could read on the pages of one report being substantially incorporated into another customer's report by means of "printing," "duplication," etc.
Despite what the majority contends (see majority op at 7-8), there is never a situation in which an AdIndex report to one client will be substantially incorporated into the AdIndex report of another client. Furthermore, it has long been held that the term "substantially included" in section 1105 (c) (1) does not refer to unfurnished background [*8]information upon which a report is based. In Matter of New York Life Ins. Co. (80 AD2d 675 [3d Dept 1981])—a case involving the exclusion of private investigative reports from section 1105 (c) (1)—we affirmed, "for reasons stated," the Appellate Division's rejection of the Tax Commission's "doubtful theory that the investigative agencies might receive a request to conduct an investigation of a party previously investigated, and that it might have information in its files which may or may not become substantially incorporated in the subsequent report" (id. at 677). It was held that, "[a]t best, the first report might serve as a lead and cannot be equated with substantially incorporating previously obtained information" (id.). The Court then cautioned,
"Were we to adopt the respondent's reasoning we would be, by implication, reading into the language of the statute a limitation for which no sound reason can be found and which could render the exclusion futile. The respondent overlooks the fact that it is the vendor's activities that are the focus of this section and it is aimed at information supplied by businesses whose primary function is to collect and disseminate information. In construing a statute, the court should consider the mischief sought to be remedied and should favor the construction which will suppress the evil and advance the remedy" (id. at 677).
The majority overlooks this sound reasoning and, instead, embraces the Tribunal's contention, erroneously accepted by the Appellate Division, that anonymized background information used for benchmarking in an AdIndex report, and stored in the MarketNorms database, is substantially incorporated in subsequent AdIndex reports because it is of "qualitative value" to the AdIndex report (majority op at 6-8). That interpretation judicially nullifies the exclusion created by the legislature. As warned in New York Life, it renders the exclusion futile because no information service will ever be able to qualify for it (see 80 AD2d at 677, affd 55 NY2d 760). That is because "[i]t is the sale of the service of furnishing information by a business whose function it is to collect and disseminate information which is taxable under Tax Law § 1105 (c) (1) and not the mere sale of information" (Matter of Audell Petroleum Corp, v New York State Tax Commn., 69 NY2d 818, 819-820 [1987] [emphasis added]). Consequently, the exclusion becomes futile if it does not apply to qualitatively valuable background information that is never furnished to anyone and is simply used for benchmarking. It is hard to imagine a business, whose "function" it is to collect and disseminate information, for whom that information is not "qualitatively valuable."
Furthermore, if the word "substantially" in this context is read as denoting the qualitative importance of the background information used to create reports, that flies in the face of "Example 3" in the Department's regulations (see supra at 5, quoting 20 NYCRR 527.3 [b]). In that example, the Department does not focus on the qualitative value of the background information (e.g., the "withholding tax tables") to the information service's furnishing of payroll information to its customers. Instead, the Department opines that the fee charged to each subscriber is not taxable because the results of the payroll computation are not furnished to others. As a result, excluded from [*9]taxation are both the underlying withholding tables and the underlying employee information, as well as the results (i.e., reports) of the service's computations. If the underlying data qualitatively valuable to that service is excluded from taxation, the underlying MarketNorms data valuable to AdIndex should be excluded as well.
VI.
The majority's opinion today also cuts against precedent holding that the focus of the second clause of the exclusion is on whether there is "substantial overlap" between the "significant and ultimate information" set forth in furnished reports (Matter of Rich Prods. Corp. v Chu, 132 AD2d 175, 178-179 [3d Dept 1987], lv denied 72 NY2d 802 [1988]). In other words, the test is whether the "significant and ultimate information" furnished in a report for one client may "substantially overlap" with the "significant and ultimate information" furnished to another client in another report (id. at 179 [emphasis added]).
Here, that overlap is lacking. All petitioner furnishes to another client, for purposes of taxation, is where that particular client falls on a bell curve or bar chart created using aggregated, anonymized benchmarking data from MarketNorms and that particular client's personalized survey questions. But the underlying benchmarking data is never furnished to the client.
The statute taxes only information actually furnished by an information service to a client, and it limits the "substantially incorporated" inquiry to determining whether information provided in a report furnished to one client may be "substantially incorporated" in a report furnished by that service to another client. Here, all petitioner incorporated in the slides at issue is a number rating of how the performance of one client's advertising campaign compared to the benchmark performance average of other, anonymized advertising campaigns. However, because a client's number ratings are never incorporated in reports given to other clients, the most that can be incorporated into a slide given to another client is the, anonymized, benchmark performance average. That is hardly "substantial."
An understanding of benchmarking makes plain the flaw in the majority's reasoning. As petitioner explains, the following excerpt from a taxed AdIndex report shows that petitioner's benchmarking is based on a bell-curve distribution of past studies:

As shown in this excerpt, the purpose of the slide is simply to tell a client, "Where in the distribution does your campaign rank?" Was it "below average," "average," "above average," or "excellent?" The extent to which any information from prior studies is furnished is represented by a bell curve containing no details, no brand names, and no campaign-specific information. All that is furnished is an anonymized distribution line or, in some cases, a similarly aggregated bar chart.
Petitioner explains that the metrics for the campaign being studied are then overlaid onto the distribution line to show how it performed relative to all prior studies in the same category or industry. The percentages, color-coding, and labels (below average, average, etc.) match the explanation on the excerpt discussed above. Then, added to the chart, are the actual scores the study earned in different categories. This is shown in the excerpt below:

This excerpt from the record shows that, in this instance, the tourism board's advertising campaign performed "below average" (below the 40th percentile) when addressing whether respondents recalled seeing the subject of the advertisement online (defined as "Online Ad Awareness") and whether respondents were likely to buy or take part in the subject of the advertisement (defined as "Visitation Intent"). It also shows that the campaign performed "excellent" (80th percentile or higher) when considering whether respondents were likely to research the subject being advertised in the future (defined as "Research Intent").
That is the extent of the MarketNorms scoring data shown in the AdIndex report. The report does not say what campaigns were included in the aggregated, anonymized data set; how any one of them performed; what survey responses were provided in them; or what petitioner told any of them about how their ads performed or how they could be improved. The only thing the client learns from this information is the average performance of unnamed prior campaigns.
Of course, if petitioner supplied all of its clients with all of the raw data behind the benchmark, the issue would be different. But none of petitioner's AdIndex clients ever see the raw data stored in the MarketNorms database. All an AdIndex report includes is [*10]a performance ranking on one or two slides to show how the advertising campaign being studied performed as compared to a set of previous campaigns in the same industry. Moreover, petitioner agrees that a subscription to its MarketNorms database—an entirely different product than AdIndex—is taxable, and it pays tax on that product, because there is nothing personal and unique about a subscription to petitioner's MarketNorms database.
This demonstrates that the majority stumbles not only in accepting the Tribunal's interpretation of the phase "substantially incorporated" but also in blessing the Tribunal's application of that interpretation. According to the majority, it was reasonable for the Tribunal to determine that the term "substantially incorporated," as used in the exclusion, barred from the exclusion any information contained in one report that may be later incorporated into underlying benchmarking data used, but not furnished, in another report given to another client.
That holding fails to pass muster even under the heightened test for ambiguous exclusions, which the majority mistakenly applies to the plain language of the exclusion at issue here. Even where an exclusion is ambiguous, we may overrule the Tribunal's interpretation if it is "shown to be erroneous, arbitrary or capricious" (Matter of 677 New Loudon Corp. v State of New York Tax Appeals Trib., 19 NY3d 1058, 1060 [2012], quoting Matter of Grace v New York State Tax Commn., 37 NY2d 193, 196 [1975]). And if the Tribunal's interpretation of the statute is irrational, that is error, and we need not delve into whether there was substantial evidence to support a determination premised on an erroneous interpretation (cf. majority op at 4).
Unfortunately, the majority adopts the Tribunal's irrational reading of the exclusion, and it rejects petitioner's interpretation of the exclusion because it is supposedly at odds with the concept of "substantiality" as used in other legal contexts. However, by inferring that the legislature intended the statement "excluding the furnishing of information which is not or may not be substantially incorporated in reports furnished to other persons" to mean a particular thing in this legal context because the word "substantially" or "substantial" has particular meanings in other contexts, without considering the statutory text surrounding that statement, the majority falls prey to "what logicians describe as the 'fallacy of vicious abstraction' " (Mehanna v U.S. Citizenship and Immigration Services, 677 F3d 312 [6th Cir 2012] [internal quotation marks omitted], quoting Jilin Pharmaceutical USA, Inc. v Chertoff, 447 F3d 196, 204 n 9 [3d Cir 2006]). The majority engages in this fallacy by ripping the statement "is not or may not be substantially incorporated in reports furnished to other persons" from the text of the statute and mutating its meaning into something the legislature never intended (see Jilin Pharmaceutical USA, 447 F3d at 204 n 9).
This is contrary to our precedent, which requires us to "giv[e] a plain and logical meaning to the language of the statute" (Charter Dev. Co., 6 NY3d at 582). We fail to follow this principle when we read select statutory language "in isolation" (id.). Here, that "results in a construction that does not give effect to the other words in the statute" (id.).
The purpose of New York's sales and use tax is to tax "sales, rental and leases of most tangible personal property" (1965 NY Legis Ann at 432 [emphasis added]). [*11]Section 1105 (c) (1) in particular taxes "[t]he furnishing of information by printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner, including the services of collecting, compiling or analyzing information of any kind or nature and furnishing reports thereof to other persons." In other words, it taxes information contained in tangible reports that can be reproduced and furnished in other tangible reports. It taxes the reproduction of information appearing on the face of a report, not the background information used to create the report but never furnished in the report.
As used here, "substantially" means "fully, amply; to a great extent or degree; considerably; significantly; much" (Oxford English Dictionary Online [accessed Apr. 3, 2025]; see also Webster's Third New International Dictionary [2002] [defining substantially as "in a substantial manner: so as to be substantial"]). The majority, however, presents its own dictionary definition in support of its view (see majority op at 7). But what the majority provides is the definition of the word "substantial" as it appeared in the version of Black's Law Dictionary in print when the legislature enacted section 1105 (c) (1). But the exclusion in section 1105 (c) (1) does not use the word substantial, it uses the word "substantially" to modify the verb "incorporated." Interestingly, that same version of Black's Law Dictionary provides a definition of the actual word at issue here—"substantially"—which supports petitioner's plain reading of the statute: "Essentially; without material qualification; in the main; in substance; materially; in a substantial manner" (Substantially, Black's Law Dictionary, 4th Ed. at 1597 [1951] [providing an additional definition of "substantially": "About, actually, competently, and essentially" (id.)]).
The exclusion therefore protects from taxation information tangibly furnished on the pages of a report that may not to a great extent or degree be incorporated on the pages of another report. Here, the information furnished in a report to one client may not be substantially incorporated into another client's report because the information is never shared.
Nevertheless, the majority rejects petitioner's use of dictionary definitions to help understand the plain language of the statute and instead looks for meaning in cases having nothing to do with section 1105 (c) (1). What the meanings of the phrases "substantially justified" or "substantial evidence," as used in other contexts, have to do with the phrase "substantially incorporated" in the context of taxing tangible, physical property furnished in the form of reports is never explained by the majority (see majority op at 6-7). That is because there is no rational explanation for the comparison. The majority simply defines the phrase "substantially" in a void and then transplants it back into the text of the statute, giving the exclusion a meaning the legislature never intended. If this is the type of reasoning that passes for rational, a taxpayer will always lose regardless of the fallaciousness of the Tribunal's determination.
The best argument the majority can make in support of its conclusion is that the Department is taxing the reproduction of slides because those slides may contain one or two anonymized bell curves that may similarly appear on a couple pages in another stack of slides, assuming that the clients are even in the same industry. The Tribunal is taxing those slides even though the bell curves provide no particular information about the [*12]population they represent—because no client data is ever shared with another client. In what practical sense does that amount to "information . . . substantially incorporated in reports furnished to other persons" (Tax Law § 1105 [c] [1])?
As a result, the majority bars petitioner from an applicable statutory exclusion merely because one or two slides in petitioner's reports contain bell curves that, without knowing a client's placement on them, are without value to any client. Those unadorned bell curves therefore do not constitute the "significant and ultimate information" that petitioner furnishes to its clients (Rich Prods., 132 AD2d at 179). Taxing such insubstantial information is plainly not what the legislature intended. I dissent.
Judgment affirmed, with costs. Opinion by Judge Cannataro. Judges Rivera, Garcia, Singas and Halligan concur. Judge Troutman dissents in an opinion, in which Chief Judge Wilson concurs.
Decided April 17, 2025

Footnotes

Footnote 1: The dissent further implies that the data incorporated from each individual report is of minimal significance because it pertains to "basic questions regarding age, household income, gender, and high-level awareness of the brand" (dissenting op at 7). But the fact that the questions concern demographic information and "high-level" brand awareness does not mean that the responses to those questions are not as important or valuable—or perhaps even more valuable—to Dynamic's other customers than the responses to the client-specific questions.

Footnote 2: Because we decide that the exclusion does not apply as information is "substantially incorporated" we need not opine as to the meaning of the second part of the Tax Law § 1105 (c) (1) exclusion which covers information that "may not" be substantially incorporated into future reports.